# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 13-40219

United States Court of Appeals
Fifth Circuit

**FILED**

May 19, 2016

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

JAMES R. ROMANS, also known as Red; BAJUNE MOSEBY, also known as
Junebug; KEVIN HARDEN, also known as Keisha; TERRANCE BOOKER,
also known as T. B.,

Defendants - Appellants

Appeals from the United States District Court
for the Eastern District of Texas

Before DENNIS and COSTA, Circuit Judges, and ENGELHARDT, District
Judge.*

JAMES L. DENNIS, Circuit Judge:

The defendants, James Romans, Bajune Moseby, Kevin Harden, and
Terrance Booker, were convicted by a jury of conspiracy to possess with the
intent to distribute 1,000 kilograms or more of marijuana, 21 U.S.C. § 846. The
district court sentenced Romans to life imprisonment; Moseby to 293 months'
imprisonment; Harden to 360 months' imprisonment; and Booker to 280
months' imprisonment. For the following reasons, the convictions of all of the

---

* District Judge of the Eastern District of Louisiana, sitting by designation.

defendants, and the sentences of Harden, Booker, and Romans, are affirmed, but Moseby's sentence is vacated, and his case is remanded for resentencing consistent with this opinion.

I.

In 2006, James Romans and Eric Pieper began running a marijuana distribution operation in Indianapolis, Indiana. Initially, Pieper bought 1,000 pounds of marijuana every week from the Mexican supplier Cruz López Acevedo ("López") for distribution. Trucks brought the marijuana into the U.S. from Mexico in 22-pound boxes, which were lined with carbon paper to conceal the drug's odor; the shipments were delivered to two warehouses and a storage yard in Indianapolis, where the marijuana was then transported to stash houses for sorting and repackaging for distribution. Pieper and Romans shared the associated expenses and split the resulting profits equally. Their operation involved a number of other people, divided into two groups: Pieper was responsible for one group, which included Terrance Booker, Kevin Harden, and Bajune Moseby, while Romans was responsible for the other group, which included Gary Hanley, Michael Smith, Matthew White, and Jeremy Martin. One of Pieper's close friends, Dale Zigler, was responsible for collecting drug proceeds from other members of the organization. After Pieper moved to Burleson, Texas, a suburb of Fort Worth, in 2009, Zigler continued to collect the drug proceeds in Indianapolis and delivered them by car to Pieper in Texas.

Romans was arrested by Indiana law enforcement in August 2010. A search warrant on his residence yielded $24,000, two loaded .45 caliber Springfield Armory hand guns, and a loaded Glock 357 handgun. According to the agent executing the search, the Glock was in the kitchen on top of a drug ledger. Romans entered a guilty plea to state charges of financing the delivery of over 10 pounds of marijuana and was sentenced, on October 7, 2010, to probation. Pieper testified that two weeks after Romans' arrest, while Romans

was on work release, he called Pieper and said that he "was hurting really bad, and that he wanted to get back going again." Romans reportedly told Pieper that he would pay cash for marijuana and that the members of his group were waiting to buy marijuana from him. Because "everybody was . . . skeptical about messing with him" and thought he might be cooperating with the government, Pieper testified that he refused to do business with Romans.

In November 2010, Pieper decided to promote Moseby and Harden within the organization. Pieper, Moseby, and Harden met in Texas and attended a professional boxing match in Dallas. Ultimately, the men agreed that Pieper and Moseby would each receive 35 percent of the profits from the drug trafficking business, while Harden would receive 30 percent. During the trip, the men bought new cellphones and drove to Frisco, Texas—in the Eastern District—where Pieper was planning to move. On December 31, 2010, Zigler flew from Indianapolis to Dallas-Fort Worth to help Pieper move to Frisco; he brought $9,000 in drug proceeds with him. Two weeks later, on January 13, 2011, Zigler again flew to Texas to help Pieper finish the move from Burleson to Frisco. On this trip, Zigler brought drug proceeds that he had collected from Harden.

The Indiana police and the DEA began collecting information about the organization practically at its inception. On January 25, 2007, Moseby and four other men convened in a truck stop in Indianapolis to meet a semi-truck—driven by an undercover DEA agent—which contained a shipment of 1,000 pounds of marijuana sent by López. Moseby watched as two of the men transferred the shipment from the truck to a Chevrolet Tahoe; he then picked the two men up in his own vehicle and followed the Tahoe, driven by a third man, out of the truck stop. Indiana State Police soon pulled over the Tahoe and later stopped and identified Moseby. On September 16, 2010, police in Indianapolis stopped a white van driven by Delores Jose Montes-Venegas, one

of López's runners. The van had previously been seen at Romans's and Harden's houses. When the officer approached, he noticed the strong odor of raw marijuana and noted that Montes-Venegas was very nervous and sweating profusely. Police searched the van and found 89 apparently identical boxes—lined with carbon paper—each containing two 11-pound bundles of marijuana. Appellant Booker also had multiple encounters with law enforcement, culminating in a December 30, 2010, traffic stop during which an officer from the Speedway Police Department in Indiana found five Ziploc bags of marijuana, weighing roughly five pounds, in Booker's vehicle. Booker told the responding detective that he recently received the marijuana from other members of the conspiracy and intended to sell it for $850 per pound.

On June 8, 2011, an indictment was filed against Romans, Moseby, Harden, Booker, and 12 other individuals in the United States District Court for the Eastern District of Texas. A superseding indictment was filed on January 11, 2012. Several of the charged individuals, including Eric Pieper and his brother, Michael Pieper, pleaded guilty to conspiracy charges and did not go to trial but became government witnesses against the other co-conspirators. In September 2012, after a trial, a jury convicted Romans, Moseby, Harden, and Booker of conspiracy to possess with the intent to distribute 1,000 kilograms or more of marijuana, in violation of 21 U.S.C. § 846, as charged in Count One of the superseding indictment. Thereafter, on February 24, 2013, the district court sentenced Romans to life imprisonment, Moseby to 293 months' imprisonment, Harden to 360 months' imprisonment, and Booker to 280 months' imprisonment.

## II.

On appeal, Romans, Moseby, Harden, and Booker contend that the district court erred in denying their motions for judgment of acquittal based on the argument that venue was improper in the Eastern District of Texas. When

No. 13-40219

a venue challenge is properly preserved by a motion for judgment of acquittal, we review the district court's ruling de novo. *United States v. Thomas*, 690 F.3d 358, 368 (5th Cir. 2012). After considering the evidence in the light most favorable to the verdict, we will affirm where "a rational jury could conclude 'that the government established venue by a preponderance of the evidence.'" *Id.* (quoting *United States v. Garcia Mendoza*, 587 F.3d 682, 686 (5th Cir. 2009)); *see also United States v. White*, 611 F.2d 531, 536 (5th Cir.), *cert. denied*, 446 U.S. 992 (1980) ("This Circuit has not treated territorial jurisdiction and venue as 'essential elements' in the sense that proof beyond a reasonable doubt is required.").

The general statute that seeks to clarify venue in the case of multi-district crimes is 18 U.S.C. § 3237. It provides that any offense begun in one district, but completed in another, or committed in more than one district, may be prosecuted in any district in which the offense was begun, continued, or completed. 18 U.S.C. § 3237(a). Thus, "[v]enue can be based on evidence of any single act that initiated, perpetuated, or completed the crime, and circumstantial evidence suffices to establish venue." *Thomas*, 690 F.3d at 369. In conspiracy cases, "venue is proper in any district where the agreement was formed or an overt act occurred." *United States v. Caldwell*, 16 F.3d 623, 624 (5th Cir. 1994). As we noted in *Caldwell*, "[t]he Supreme Court has upheld the application of this rule, even where it permits trial against defendants in a district they never even set foot in prior to trial." *Id.* at 624 (citing *Hyde v. United States*, 225 U.S. 347, 362 (1912)). "An overt act is an act performed to effect the object of a conspiracy, although it remains separate and distinct from the conspiracy itself." *United States v. Pomranz*, 43 F.3d 156, 160 (5th Cir. 1995). "Though the act need not be of a criminal nature, it must be done in furtherance of the object of the conspiracy." *Id.* Finally, "[a]s a matter of law, a conspiracy continues until the evidence affirmatively shows that the

5

No. 13-40219

conspirators terminate the alleged conspiracy, or with respect to conspirators individually, until the conspirators withdraw." *United States v. Freeman*, 434 F.3d 369, 383 (5th Cir. 2005). Where a conspiracy to possess with intent to distribute drugs "contemplates a continuity of purpose and continued performance of acts, [the conspiracy] is presumed to exist until there has been an affirmative showing that it has terminated." *Id.* at 383 n.2 (quoting *United States v. Mayes*, 512 F.2d 637, 642-43 (6th Cir. 1975)).

In *Garcia Mendoza* this court held that "one co-conspirator's travel through a judicial district in furtherance of the crime alleged establishes venue as to all co-conspirators." 587 F.3d at 687. This court has recognized that, in a conspiracy to possess with intent to distribute drugs, "[t]he overall objective or goal [is] for everyone in the conspiracy to profit from the illicit purchase and selling of [drugs]." *United States v. Morris*, 46 F.3d 410, 415 (5th Cir. 1995). Thus the transportation of drug proceeds is an act in furtherance of a drug conspiracy. *See United States v. Ramirez*, 555 F. App'x 315, 319 (5th Cir. 2014) (unpublished); *United States v. Anthony*, 201 F. App'x 211, 213 (5th Cir. 2006) (unpublished). In this case, Dale Zigler testified that after Eric Pieper moved from Indiana to Grand Prairie, Texas, in 2009, Zigler routinely collected drug proceeds from Appellants in Indianapolis and drove the money to Pieper in Texas, every time taking a route that passed through the Eastern District.[1] A page of the road atlas that Zigler used on his trips was entered into evidence,

---

[1] Although Zigler was not charged with conspiracy to possess with intent to distribute marijuana, he testified that he was involved in Appellants' organization. Specifically, he stated that "[his] role was to pick up the drug money when [he] was directed to do so." A rational jury could have determined that Zigler's membership in the conspiracy and his transportation of drugs in furtherance of that conspiracy were proven by a preponderance of the evidence. *See Anthony*, 201 F. App'x at 213 (finding that the evidence was sufficient to support the defendant's conviction for conspiracy to possess with intent to distribute where "the record supports a finding that [he] knew the co-conspirators, knew of the conspiracy, and knew that his actions [transporting drug proceeds] were in furtherance of that conspiracy").

on which a section of this route—I-30 connecting Texarkana and Dallas, crossing the Eastern District—was highlighted.  Eric Pieper testified that he directed Zigler to make the trips from Indiana to Texas and that each time he would arrange for either Romans or Moseby to meet Zigler and give him the cash proceeds.  Eric Pieper's brother Michael, who pleaded guilty to conspiracy charges for his participation in the drug organization, testified that after he moved to Burleson, Texas, in May 2010, he drove to Indianapolis to pick up drug proceeds five or six times and followed I-30 from Texarkana into the Dallas-Fort Worth area.  Thus the record contains evidence that at least two members of the conspiracy traveled through the Eastern District of Texas to transport drug proceeds, an act in furtherance of the conspiracy.  Viewing the evidence in the light most favorable to the verdict, we conclude that a rational finder of fact could have found that venue in the Eastern District of Texas was proven by a preponderance of the evidence.

### III.

Individually, Appellant Booker argues that the evidence at trial was insufficient to establish that he was a member of the charged conspiracy.  We review challenges to the sufficiency of the evidence de novo.  *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012).  This court reviews the record to determine whether, considering the evidence and all reasonable inferences in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979).  Our "inquiry is limited to whether the jury's verdict was reasonable, not whether we believe it to be correct."  *United States v. Moreno-Gonzales*, 662 F.3d 369, 372 (5th Cir. 2011).  Thus, in this instance, we must determine whether the evidence presented at trial, viewed in the light most favorable to the government, was sufficient to allow the jury to conclude, beyond a reasonable

doubt, that Booker participated in the marijuana distribution conspiracy led by Pieper.

"In order to prove conspiracy to possess and distribute drugs, the Government must prove beyond a reasonable doubt: (1) the existence of an agreement between two or more persons; (2) the defendant's knowledge of the agreement; and (3) the defendant's voluntary participation in the conspiracy." *United States v. Tenoio*, 360 F.3d 491, 494 (5th Cir. 2004). An agreement may be inferred from a "concert of action," *United States v. Landry*, 903 F.2d 334, 338 (5th Cir. 1990), and "[t]he agreement, a defendant's guilty knowledge and a defendant's participation in the conspiracy all may be inferred from the 'development and collocation of circumstances.'" *United States v. Maltos*, 985 F.2d 743, 746 (5th Cir. 1992).

Eric Pieper testified that Booker was one of his "people," one of the customers in Indianapolis through whom he distributed the marijuana shipments arriving weekly from Mexico. Pieper testified that his brother Michael delivered marijuana to Booker. Zigler testified that Pieper once directed him to pick up money from Booker and that Booker gave him $10,000 in a Ziploc bag. John Wilson, who pleaded guilty to the conspiracy, testified that Pieper once sent Booker to deliver a box of marijuana to him. Photographs were introduced into evidence showing Booker on vacation with Appellant Harden and Eric and Michael Pieper and in a limousine with supplier López. And evidence was presented that police found boxes lined with carbon paper— a method used by the organization to conceal the smell of marijuana— throughout Booker's home, some empty and some containing bricks or bags of marijuana. Viewing the evidence in the light most favorable to the verdict, we find that the Government presented significant evidence of concurring acts, actors, and events—a "collocation of circumstances," *Maltos*, 985 F.2d at 746—

from which a rational trier of fact could have found beyond a reasonable doubt that Booker was a member of the charged conspiracy.

## IV.

Individually, Appellant Harden argues that the district court abused its discretion by refusing to appoint substitute counsel for him; that he did not knowingly, intelligently, and voluntarily waive his right to counsel; that his bottom-of-the-Guidelines sentence of 360 months is substantively unreasonable; and that his sentence should be vacated as void in light of the Supreme Court's recent decision in *Johnson v. United States*, 135 S. Ct. 2551, 2536 (2015), holding that the imposition of an increased sentence under the residual clause in the Armed Career Criminal Act (ACCA) violates the Constitution's guarantee of due process.

## A.

We review Sixth Amendment claims de novo. *United States v. Simpson*, 645 F.3d 300, 307 (5th Cir. 2011). An indigent defendant who cannot afford to retain an attorney has an absolute right to have counsel appointed by the court. *See Gideon v. Wainwright*, 372 U.S. 335, 342 (1963); *Johnson v. Zerbst*, 304 U.S. 458, 463 (1938). Further, "the right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970). Absent a Sixth Amendment violation, a court's refusal to appoint substitute counsel is reviewed for an abuse of discretion. *Simpson*, 645 F.3d at 307. "A district court abuses its discretion if it bases its decision on an error of law or a clearly erroneous assessment of the evidence." *United States v. Teuschle*r, 689 F.3d 397, 399 (5th Cir.2012) (internal quotation marks and citations omitted). "In order to warrant a substitution of counsel during trial, the defendant must show good cause, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an

apparently unjust verdict." *United States v. Young*, 482 F.2d 993, 995 (5th Cir. 1973) (quoting *United States v. Calabro*, 2d Cir. 1972, 467 F.2d 973, 986).

Harden was appointed counsel, and he does not allege that his representation by the appointed counsel was constitutionally deficient. Rather, he argues that lack of communication and disagreements with his attorney constituted good cause that should have entitled him to substitute counsel. Harden points to three letters that he filed with the district court in which he voiced complaints about his appointed counsel. In the first, Harden cited lack of communication with the attorney, Reginald Smith, and complained that Smith did not listen to his concerns about the case. After a hearing, Harden informed the court that he and Smith had talked and he wanted to withdraw his complaint. In the second, Harden again noted that he was having "major problems with" Smith and expressed concern that the attorney had "a negative attitude" towards him and believed that he was guilty. Six months later, after Smith had filed several motions in limine on his behalf, Harden submitted his third letter, in which he complained that Smith was not filing the motions that he wanted him to file and asserted that he wanted to proceed pro se. Soon afterward, Smith moved to withdraw. Smith's motion informed the court that Harden had filed a grievance against him with the State Bar of Texas. Smith noted that, although the grievance was dismissed, he had sought Harden's written agreement to waive the potential conflict it caused. Smith continued to file motions on Harden's behalf until the court granted Harden's motion to represent himself.

Although it is evident that Harden mistrusted and disliked Smith, there is no indication that there was a "complete breakdown in communication" or an "irreconcilable conflict" between the two, nor is there any evidence of a conflict of interest. The district court held a hearing after receiving each of Harden's letters and determined that good cause had not been shown to

warrant replacing Smith.  Harden has not shown that the district court abused its discretion by failing to appoint substitute counsel.  *See Simpson* 645 F.3d at 308-09.

## B.

We review claims concerning the right of self-representation de novo. *United States v. Cano*, 519 F.3d 512, 515-16 (5th Cir. 2008).  A criminal defendant has a Sixth Amendment right to conduct his own defense, even if he does so to his detriment, if his decision to do so is voluntary, knowing, and intelligent. *Farretta v. California*, 422 U.S. 806, 833-34, 835-36 (1975).  The defendant must "unequivocally inform the court of his desire to represent himself," and the court must determine, through a *Farretta* hearing, whether the defendant is "knowingly and intelligently" choosing to represent himself. *Cano*, 519 F.3d at 516.

Harden argues that his decision was involuntary because it occurred only after the district court refused to substitute counsel.  Although a court cannot force a defendant to choose between constitutionally deficient or disqualified counsel and no counsel at all, "[a] defendant's refusal without good cause to proceed with able appointed counsel constitutes a voluntary" decision to proceed pro se. *Dunn v. Johnson*, 162 F.3d 302, 307 (5th Cir. 1998).  Harden does not allege that Smith's performance was constitutionally deficient, and, as previously discussed, he did not show good cause to warrant substitution of counsel.  Furthermore, at the June 5, 2012 *Farretta* hearing at which the district court granted Harden's request to proceed pro se, with attorney Smith serving as standby counsel, the court advised Harden against self-representation several times and asked Harden a litany of questions to determine whether his decision to represent himself was knowing, intelligent, and voluntary.  The district court specifically asked Harden if he would still want to represent himself if the court "was going to replace Mr. Smith and give

11

[him] different counsel." Harden responded, "Yeah, I'd like to represent myself." Based on this record, we find that Harden's decision to represent himself was voluntary, knowing, and intelligent.

## C.

Harden argues that his within-Guidelines sentence of 360 months imprisonment is substantively unreasonable and greater than necessary to achieve the goals of sentencing under 18 U.S.C. § 3553. We review a sentence for reasonableness using a two-step process: first, we must ensure that the district court did not commit any significant procedural error; then, we must consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard, taking into account the totality of the circumstances. *Gall v. United States*, 552 U.S. 38, 51 (2007). Sentences within the properly calculated Guidelines range are presumed to be substantively reasonable. *United States v. Gutierrez-Hernandez*, 531 F.3d 251, 254 (5th Cir. 2009). We "will give great deference to [a procedurally reasonable, within-Guidelines] sentence and will infer that the [district] judge has considered all the factors for a fair sentence set forth in the Guidelines in light of the sentencing considerations set out in § 3553(a)." *United States v. Compos-Maldondo*, 531 F.3d 337, 338 (5th Cir. 2008) (internal quotations and citations omitted). To rebut the presumption that sentences within the properly calculated Guidelines range are reasonable, a defendant must show that the district court did not account for a factor that should have received significant weight, gave significant weight to an improper factor, or clearly erred in balancing the sentencing factors. *United States v. Cooks*, 589 F.3d 173, 186 (5th Cir. 2009).

Harden does not contend that his sentence was procedurally unreasonable, and there is no evidence of procedural error. In arguing that his sentence is substantively unreasonable, Harden emphasizes that he will not

be released until he is almost 70 years old, and that even at the age of 38 he suffers from serious heart problems.  Relying on the Sixth Circuit's opinion in *United States v. Payton*, 754 F.3d 375 (6th Cir. June 12, 2014), Harden contends that, in selecting his sentence, the district court erroneously failed to take into account that the risk of recidivism is shown to decline after the age of 50, in part because older offenders have more health problems than younger offenders.  In *Payton*, the Sixth Circuit held that the defendant's above-Guidelines sentence of 45 years—more than double the Guidelines recommendation—was substantively unreasonable in part because of the district court's failure to adequately respond to the defendant's argument that his age would decrease his chances of recidivism.  In contrast to Payton, Harden received a sentence that was not only within, but actually at the bottom of, the advisory Guidelines range.  And unlike in *Payton*, the district court here adequately responded to Harden's argument:  the court considered Harden's request for a downward departure but concluded that because his history of serious health problems had not prevented him from trafficking in large quantities of marijuana it was not grounds for a variance.  Harden has not shown that the district court erred in balancing the sentencing factors or that the Guidelines sentence imposed was an abuse of discretion, nor has he rebutted the presumption of reasonableness that applies to his bottom-of-the-Guidelines sentence.

## D.

Harden asserts that because the district court classified him as a career offender pursuant to the "residual clause" found at U.S.S.G. § 4B1.1, his sentence must be vacated in light of the Supreme Court's decision in *Johnson,* which held that imposing an increased sentence under the residual clause in the ACCA violates the Constitution's guarantee of due process.  135 S. Ct. at 2563.  Harden argues that because the residual clause in the Sentencing

Guidelines is "identical" to that in the ACCA, *Johnson*'s logic applies with equal force to sentences calculated under either statute. Even assuming that *Johnson* does apply to the Guidelines' residual clause, Harden's argument necessarily fails: the district court's application of the residual clause did not increase Harden's sentence. In determining Harden's criminal history category the presentence report (PSR) and the district court relied on the career offender adjustment in U.S.S.G. § 4B1.1(b). Without application of that adjustment, Harden's criminal history category would have been V; with it, the PSR and the district court determined that his criminal history category was VI. But Harden's total offense level—based on a finding that he was responsible for at least 10,000 kilograms but less than 30,000 kilograms of marijuana and that he operated a stash house for the drug organization—was 38. The range of imprisonment for an offender with a total offense level of 38 and criminal history category V is the same as that for an offender with a total offense level of 38 and criminal history category VI: both yield an advisory Guidelines range of 360 months to life. U.S.S.G. Chapter 5, Part A. As discussed, Harden was sentenced at the bottom of this range. Because Harden's sentence was not increased under the residual clause, we need not determine whether, under *Johnson*, any part of U.S.S.G. § 4B1.1 is void.

V.

Appellant Moseby argues, in his pro se brief, that the district court plainly erred in failing to dismiss the indictment in light of prosecutorial misconduct; that the district court lacked subject-matter, territorial, and personal jurisdiction, and that he is entitled to a writ of prohibition; and that the district court plainly erred in imposing Sentencing Guidelines enhancements on the basis of facts that were not found beyond a reasonable doubt by the jury. In his supplemental brief, filed by appointed appellate counsel, Moseby argues that the district court erred in enhancing his total

offense level based on possession of a firearm pursuant to U.S.S.G. § 2D1.1(b)(1) and that the district court erred in enhancing his total offense level by two points for maintaining a drug premises pursuant to U.S.S.G. § 2D1.1(b)(12).

A.

Moseby argues that the district court erred in failing to dismiss the indictment; however, he did not move for dismissal of the indictment before trial.  Unpreserved allegations of prosecutorial misconduct are reviewed for plain error.  *United States v. Tomblin*, 46 F.3d 1369, 1386 (5th Cir. 1995).  A defendant seeking reversal for plain error must show an error, that was plain, and that affected his substantial rights. *United States v. Isgar*, 739 F.3d 829, 839 (5th Cir. 2014).  If the defendant satisfies these three conditions, we have discretion to correct the error, "but only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Andaverde-Tinoco*, 741 F.3d 509, 518 (5th Cir. 2013).  The burden remains on the defendant to prove this fourth requirement. *Id.* at 523.

Moseby, in his pro se brief, claims that perjured testimony, "favors," and prosecutorial misconduct led the grand jury to indict.  Moseby bears the burden of proving that the indictment was procured by prosecutorial misconduct. *See United States v. Marcello*, 423 F.2d 993, 1000 (5th Cir. 1970).  His assertion that the government used perjured testimony and that "favors" were done is conclusory and not supported by any evidence of record.   He has not demonstrated that an error occurred, let alone that it was plain and that it affected his substantial rights.  The district court therefore did not plainly err in failing to dismiss the indictment on its own motion.

B.

Moseby argues that the district court lacked subject-matter, territorial, and personal jurisdiction, and that he is entitled to a writ of prohibition.  We

review these issues de novo.  Federal district courts have exclusive and original jurisdiction over all federal crimes.  18 U.S.C. § 3231.  That jurisdiction is invoked by an indictment charging a defendant with violating federal law. *Isgar*, 739 F.3d at 838.  The right of a federal criminal defendant to be tried in the district in which the crime was committed is guaranteed by Article III, Section 2, Clause 3 of the United States Constitution; the Sixth Amendment; and Rule 18 of the Federal Rules of Criminal Procedure.  "Although the Supreme Court has made it clear that questions of venue and territorial jurisdiction are not to be taken lightly or treated as mere technicalities, and the burden of proving that the crime occurred in the district of trial is squarely on the prosecution, the prosecution is not required to meet the reasonable doubt standard applicable to all substantive elements of an offense."  *White*, 611 F.2d at 534 (internal citations and quotations omitted).  Rather, "[i]f the Government shows by a preponderance of the evidence that the crime was committed in the trial district, both territorial jurisdiction and proper venue are established."  *Id*. at 535.

The superseding indictment specified that Moseby was charged with conspiring to possess with the intent to distribute marijuana, in violation of 21 U.S.C. § 846, and that overt acts occurred within the trial district.  As discussed above, the Government established by a preponderance of the evidence that venue was proper in the Eastern District of Texas.  Given the foregoing, Moseby's jurisdictional arguments are without merit, and he is not entitled to a writ of prohibition.  *See United States v. Hitchmon*, 602 F.2d 689, 694 (5th Cir. 1979) (a writ of prohibition is appropriate "[i]n the rare case where a district court proceeded wrongly, assuming the notice of appeal to be ineffective") (superseded by statute on other grounds as stated in United States v. Martinez, 763 F.2d 1297, 1308 (11th Cir. 1985)).

16

C.

Moseby does not challenge the sufficiency of the evidence supporting the court's calculation of his Guidelines range. Rather, he contends that the district court plainly erred in imposing Sentencing Guidelines enhancements on the basis of facts that were not found beyond a reasonable doubt by the jury. In general, facts relevant to sentencing need only be proved by a preponderance of the evidence. *United States v. Watts*, 519 U.S. 148, 156 (1997). However, in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the Court found that, except for the fact of a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." In *Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013), the court extended this logic to facts that increase the statutory mandatory minimum sentence. The Court in *Alleyne* did not address discretionary guideline enhancements, and as this court noted in *United States v. Hinojosa*, 749 F.3d 407, 411 (5th Cir. 2014), "[t]he *Alleyne* opinion did not imply that the traditional fact-finding on relevant conduct, to the extent it increases the discretionary sentencing range for a district judge under the Guidelines, must now be made by jurors."

Moseby was convicted of conspiracy to possess with intent to distribute 1,000 kilograms of marijuana. According to the PSR, he was responsible for 5,962 kilograms, resulting in a base offense level of 34. He received a two-level upward adjustment for maintaining a premises used to distribute marijuana and a two-level upward adjustment for possessing a firearm in connection with the drug offense. "Based upon a preponderance of the evidence presented and the facts in the report," the district court concluded that his total offense level was 38 and his criminal history level was I, which resulted in an advisory guideline range of 235 to 293 months' imprisonment. After considering the § 3553(a) factors, the court sentenced him to 293 months. His statutory

sentencing range was "not less than 10 years or more than life." 21 U.S.C. § 844; 21 U.S.C. § 841(b)(1)(A). Because the findings related to drug quantity and other guideline adjustments neither increased Moseby's mandatory minimum sentence nor caused his sentence to exceed the statutory maximum, but instead only caused his discretionary Guidelines range to exceed the statutory minimum, the facts were only required to be proven by a preponderance of the evidence. *See Hinojosa*, 749 F.3d at 412-13.

### D.

Moseby argues that the district court erred in enhancing his total offense level based on possession of a firearm in connection with the drug offense pursuant to U.S.S.G. § 2D1.1(b)(1). This court reviews the district court's interpretation of the Sentencing Guidelines de novo. *United States v. Serfass*, 684 F.3d 548, 549 (5th Cir. 2010). However, the district court's determination that the enhancement applies is a factual finding reviewed for clear error. *United States v. King*, 773 F.3d 48, 52 (5th Cir. 2014). "A factual finding is not clearly erroneous if it is plausible, considering the record as a whole." *Id.* Furthermore, "a district court is permitted to draw reasonable inferences from the facts, and these inferences are fact-findings reviewed for clear error as well." *Id.*

U.S.S.G. § 2D1.1(b)(1) provides that a two-offense-level enhancement should be applied to the sentence of a defendant convicted of conspiracy to possess with intent to distribute a controlled substance "[i]f a dangerous weapon (including a firearm) was possessed." The Government has the burden of establishing by a preponderance of the evidence "that a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant." *United States v. Salado*, 339 F.3d 285, 293-94 (5th Cir. 2003). Under this standard, "the Government must show that the weapon was found in the same location where drugs or drug paraphernalia are stored or where

part of the transaction occurred." *Id.* at 294.  Once the Government has met its burden, the defendant can only avoid the enhancement by showing that "it was clearly improbable that the weapon was connected with the offense." *United States v. Ruiz*, 621 F.3d 390, 396 (5th Cir. 2010).

Moseby contends that the Government did not meet its burden.  The initial PSR recommended an enhancement pursuant to § 2D1.1(b)(1), noting that a search of Moseby's residence had revealed "an AR-15 semi-automatic rifle, a Ruger semi-automatic pistol, and large amounts of ammunition and marijuana growing equipment."  Moseby objected to the increase on the grounds that no illegal drugs were found in the residence and that the "marijuana growing equipment" was a hydroponic growing system, which is not illegal.  Upon further review the probation office agreed; an updated PSR stated: "Since no drugs were found at the residence and there was no evidence that Moseby conducted drug transactions at this location, the two level increase for a dangerous weapon pursuant to USSG § 2D1.1(b)(1) was not applied."  The Government objected to the removal of the enhancement, and at sentencing called two witnesses to testify in support of their objection.  The first witness, Texas Department of Public Safety Officer John Logan, testified that when he searched Moseby's home in Arlington, Texas, he discovered information on growing hydroponic plants and notes referring to the purchase of marijuana seeds in the same room as the rifle and pistol.  He testified that he did not find any seeds or any drugs in the room with the weapons.  The second witness, DEA Special Agent Richard Gardner, testified that during a subsequent search of the home he discovered "notes that were evidence of the conspiracy that was charged in this case"—apparently including a "drug code sheet"—and money orders sent between other co-conspirators in the closet where the guns were found.  Like Logan, Garner stated that he did not find any seeds or any drugs in the home.

The district court found that the hydroponic growing system was "drug paraphernalia" and that the drug code sheet tied the guns to the drug conspiracy. We disagree. "Drug paraphernalia" is defined at 21 U.S.C. § 863(d) as:

> any equipment, product, or material of any kind which is primarily intended or designed for use in manufacturing, compounding, converting, concealing, producing, processing, preparing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance, possession of which is unlawful under this subchapter.

Although the district court concluded that "it's naive to think that a member of an organization that's dealing in marijuana in these large quantities and has a hydroponic growing system is going to grow tomatoes," all of the evidence presented indicated that the system found in Moseby's home was primarily designed and intended for general gardening use. The evidence did not establish that the instructions provided with the system referred to marijuana cultivation, *see* § 863(e)(1), or that any materials explaining the system's use depicted or referred to marijuana, *see* § 863(e)(2).

Of course, we are not bound by § 863(d)'s definition of drug paraphernalia. Nevertheless, this definition is instructive, particularly when viewed in light of our cases applying U.S.S.G. § 2D1.1(b)(1). We have previously applied the label "drug paraphernalia" to crack pipes, *United States v. Mitchell*, 31 F.3d 271, 278 (5th Cir. 1994); "baggies, capsules, an electric grinder, two electronic scales, a kitchen strainer, and empty 'cut' bottles" found in close proximity to capsules of heroin, *United States v. King,* 773 F.3d 48, 51 (5th Cir. 2014); and an "electronic scale containing cocaine residue," *United States v. Caicedo*, 103 F.3d 410, 411. In all of these cases, the items deemed "paraphernalia" were clearly and directly related to the production, distribution, or consumption of drugs. In this case there was no evidence that

the hydroponic growing system had ever been used to grow marijuana and only vague circumstantial evidence to suggest that it ever would be.

Furthermore, even if we were to consider it drug paraphernalia, there was no evidence linking the growing equipment to the drug trafficking conspiracy. Eric Pieper testified that he occasionally purchased hydroponic marijuana, but it was never suggested that the organization sought to grow or distribute its own product: Pieper testified that the marijuana distributed by the organization "always came from Cruz Lopez." The equipment therefore cannot serve to establish "that a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant." *Salado*, 339 F.3d at 293-94.

The drug code sheet similarly fails to establish the necessary nexus. The sheet is not itself drug paraphernalia; it is therefore relevant only to the extent that it proves that Moseby's residence is a location "where part of the transaction occurred." *Id.* at 294. Although the code sheet, which was written by Eric Pieper, is circumstantial evidence of Moseby's participation in trafficking activities, its presence in his home does not establish that any of those activities took place there. In light of the absence of evidence at trial or at sentencing that any drug transactions occurred at Moseby's residence, the district court's inference drawn from the presence of the code sheet is not plausible. Given the absence of evidence that the weapons were found "in the same location where drugs or drug paraphernalia [were] stored or where part of the transaction occurred," *Id.* at 293-94, the Government failed to meet its burden, and application of the § 2D1.1(b)(1) enhancement was clearly erroneous. We therefore vacate Moseby's sentence and remand for resentencing.

No. 13-40219

E.

Finally, Moseby argues that the district court erred in enhancing his total offense level by two points for maintaining a drug premises.  U.S.S.G. § 2D1.1(b)(12) provides a two-level enhancement if the defendant "maintained a premises for the purpose of manufacturing or distributing a controlled substance."  The application notes provide that in determining whether a defendant "maintained" a premises, the court should consider "(A) whether the defendant held a possessory interest in (e.g., owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises."  U.S.S.G. § 2D1.1 n.17.

Moseby does not challenge the district court's finding that his Indianapolis residence was a stash house; rather, he maintains that the evidence does not establish that he either held a possessory interest in the premises or exercised control over the premises.  The crux of his argument is that Eric Pieper paid the rent for the house and directed members of the organization regarding operations at the house.  At trial, Pieper admitted that he "assist[ed] in the paying of rent," but he stated that Moseby rented the house and that it was Moseby who "went and found that [particular] house on his own."  Furthermore, Pieper indicated that, although the rent money came out of the organization's drug proceeds, Moseby remained responsible for actually paying the landlord.  While the source of the rent money is relevant, it is not determinative of possessory interest:  here, Moseby's interest in the house was created by the rental agreement.  *See, e.g.*, 52 C.J.S. Landlord & Tenant § 337 (2015).  Finally, although it was established at trial that Pieper and other members of the organization participated in trafficking activities at the house, no evidence was presented to refute the inference that Moseby had unimpeded access to and generally controlled of the use of his residence.  *See United States v. Rodney,* 532 F. App'x 465, 473 (5th Cir. 2013) (unpublished) (defendant

maintained premises for purposes of U.S.S.G. § 2D1.1(b)(12) where he had unimpeded access to the premises and used it as he wished).  The district court's finding that Moseby maintained the premises is therefore plausible in light of the record as a whole, and the application of the § 2D1.1(b)(12) enhancement was not clearly erroneous.  *See King*, 773 F.3d at 52.

## VI.

Finally, Appellant Romans argues that the District Court erred in applying a 2-level enhancement, pursuant to U.S.S.G. § 2D1.1(b)(12), for maintaining a premises for the purpose of manufacturing or distributing a controlled substance, because its application violated ex post facto clause or, alternatively, because there was insufficient evidence to support it; that the District Court erred in enhancing his total offense level based on possession of a firearm in connection with the drug offense pursuant to U.S.S.G. § 2D1.1(b)(1); that the District Court erred in applying a 4-level enhancement, pursuant to U.S.S.G. § 3B1.1(a) for being a leader/organizer, because there was insufficient evidence to support it; that his Guidelines sentence of life imprisonment is substantively unreasonable; and that the district court violated his Eighth Amendment rights by imposing a life sentence of imprisonment.

## A.

Romans challenges the district court's application of a sentence enhancement pursuant to U.S.S.G. § 2D1.1(b)(12) on two grounds.  First, he argues that the application of the enhancement violated the ex post facto clause of Article I § 9 of the U.S. Constitution, because he withdrew from the drug distribution conspiracy prior to the enactment of that enhancement provision on November 1, 2010.  *See* 75 Fed.Reg. 66188 (2010).  In *Peugh v. United States*, 133 S.Ct. 2072 (2013), the Supreme Court held that there is an ex post facto violation when a defendant is sentenced under Guidelines

promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense.  Romans contends that the series of events in evidence occurring in August, September, and October of 2010 demonstrates that he withdrew from the conspiracy prior to the enactment of U.S.S.G. § 2D1.1(b)(12) on November 1, 2010.  We disagree.

Because conspiracy is a continuing offense, "a defendant who has joined a conspiracy continues to violate the law through every moment of the conspiracy's existence, and he becomes responsible for the acts of his co-conspirators in pursuit of their common plot." *Smith v. United States*, 133 S. Ct. 714, 719 (2013) (internal quotation marks and citations omitted).  A defendant's membership in the ongoing unlawful scheme continues until he withdraws.  *Id.* at 717.  "Affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have been regarded as sufficient to establish withdrawal or abandonment." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464-65 (1978).  "Passive nonparticipation in the continuing scheme is not enough to sever the meeting of minds that constitutes the conspiracy." *Smith* at 720.  Because Congress did not address the burden of proof for withdrawal in 21 U.S.C. § 846 or 21 U.S.C. § 841, we presume that Congress intended to preserve the common-law rule that affirmative defenses are matters for the defendant to prove. *See id.*

Applying the foregoing principles, we conclude that Romans has not carried his burden of asserting an affirmative defense of withdrawal or of proving that he took affirmative acts to disavow or defeat the purpose of the conspiracy.  In a motion for judgment of acquittal, Romans argued that venue was improper as to him in part because his participation in the conspiracy ceased at the time of his arrest, before certain criminal acts were committed in

the Eastern District of Texas. The district court rejected this argument, reasoning that "no evidence was adduced at trial to suggest that Romans withdrew from the conspiracy prior to" the commission of the acts in question. At sentencing Romans did not object to the district court's application of the sentence enhancement under U.S.S.G. § 2D1.1(b)(12). The evidence presented at trial and referenced on appeal does not demonstrate that Romans committed any affirmative act to defeat, disavow or discourage the conspiracy. *See U.S. Gypsum Co.*, 438 U.S. at 464-65. On August 22, 2010, he was arrested on an Indiana state drug charge and placed on work release; in early September 2010 he called Pieper and requested to resume his active participation in the conspiracy but was rebuffed by Pieper; and on October 7, 2010, he pleaded guilty to the state drug charge and was placed on probation. In *United States v. Puig-Infante*, 19 F.3d 929, 945 (5th Cir.), *cert. denied*, 513 U.S. 864 (1994), this court held that "[b]ecause a defendant's incarceration is not an affirmative act on the part of a defendant, it cannot, by itself, constitute withdrawal or abandonment." The evidence does not reflect that Romans reported the drug distribution conspiracy to the authorities or in any way communicated to the other conspirators his desire or intention to withdraw from the conspiracy. The evidence reflects that Pieper and the other conspirators actively carried on the drug conspiracy until they were indicted by federal authorities on June 8, 2011. Consequently, we conclude that Romans has failed to carry his burden of proving that he withdrew from the conspiracy before the enhancement provision was enacted on November 1, 2010, and thus hold that the application of the § 2D1.1(b)(12) enhancement did not violate the ex post facto clause.

Romans also argues that the evidence was insufficient to support the application of the enhancement. The application note of U.S.S.G. § 2D1.1(b)(12) states that the enhancement "applies to a defendant who knowingly maintains a premises (i.e., a building, room, or enclosure) for the

purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for purpose of distribution." U.S.S.G. § 2D1.1(b)(12) n.17. The application note further provides:

> Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.

*Id.* Here, the record established that Romans provided the capital to start a paint and body shop operated by Jeremy Martin, and that Romans paid the shop's monthly rent. According to witness testimony, Romans's primary use of the body shop was to receive and distribute large quantities of marijuana: Romans apparently had no role in the legitimate operations of the shop, and at his direction boxes of marijuana were taken to there for delivery to his customers. The district court's finding that Romans maintained a premises for the purpose of distributing marijuana is therefore plausible in light of the record as a whole, and the application of the § 2D1.1(b)(12) enhancement was not clearly erroneous. *See King,* 773 F.3d at 52.

### B.

Romans argues that there was insufficient evidence to support an enhancement pursuant to U.S.S.G. § 2D1.1(b)(1). As noted above, the Government was required to show by a preponderance of the evidence that "the weapon was found in the same location where drugs or drug paraphernalia [were] stored or where part of the transaction occurred." *Salado,* 339 F.3d at 294. David Tarter, a long-time customer of Romans, testified that he delivered drug proceeds to Romans's residence on several occasions, and that on one of those occasions Romans showed him a Glock that he kept in his kitchen and

an AR-15 that he kept in his basement.  Tarter further testified that, after he was pulled over by Indiana State Police with 11 pounds of marijuana in his vehicle, he cooperated with the state investigation of Romans and allowed himself to be recorded delivering $24,000 in cash to Romans as payment for marijuana.  Detective Brian Elmore testified that when Indiana police searched Romans's home they found a Glock in a kitchen drawer with a drug ledger and the $24,000 in cash, delivered minutes before by Tarter, in the living room.  Romans argues that Tarter's testimony contradicts Detective Elmore's, but the two addressed the location of the gun at different times; Tarter did not specify when he saw the Glock and the AR-15, and he was not present when the search was conducted.  We conclude that the testimony regarding the location of the gun and the ledger and the occurrence of the drug transaction was sufficient to establish that "a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant," *id.* at 293-94, and that the district court's determination that the enhancement applied was therefore not clearly erroneous, *see King*, 773 F.3d at 52.

C.

Romans argues that there was insufficient evidence to support an enhancement pursuant to U.S.S.G. § 3B1.1(a), which provides for a four-level increase in the defendant's offense level "if the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  The application notes provide:

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

No. 13-40219

U.S.S.G. § 3B1.1 n.4.  The note also states that "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." *Id.*

It is not contested that the conspiracy in this case involved five or more participants.  As for Romans's leadership role in the organization, Eric Pieper testified that he and Romans were partners and equally split the drug profits.  He stated that López would call "every single day" asking for money, and that he and Romans would take turns "push[ing] [their] people for their money."  He stated that if López reported that the payment delivered by Michael Pieper, Bajune Moseby, or Kevin Harden was short, he and Romans would make up the difference.  Pieper also described how, in 2007, he and Romans went to Mexico to inspect the marijuana that López was going to send them in Indiana.  And although Romans contends that there is no evidence that he exercised any control over the manner in which his "customers" sold marijuana, Jeremy Martin testified that Romans directed people to conduct drug transactions at his paint shop.  Furthermore, when he pleaded guilty to state charges in 2010, Romans admitted that after he arranged for the sale of 24 pounds of marijuana to Tarter, the confidential informant, he "used Mr. [Brent] Lewellyn to transport and deliver the marijuana."  In light of the record as a whole, the district court's finding that Romans was an organizer or leader is plausible.  The application of the § 3B1.1(a) enhancement was therefore not clearly erroneous.  *See King*, 773 F.3d at 52.

D.

Romans argues that his Guidelines sentence of life imprisonment is substantively unreasonable.  Romans's sentence is within the Guidelines range, and is therefore presumptively reasonable.  To rebut the presumption of reasonableness, Romans must show that the court did not account for a factor that should have received significant weight, gave significant weight to

28

an improper factor, or that it clearly erred in balancing the sentencing factors. *United States v. Cooks*, 589 F.3d 173, 186 (5th Cir. 2009).

Romans argues that the district court failed to consider his background, lack of criminal history, and the disparity between his sentence and that given to Pieper. This argument is unavailing. The district court expressly considered Romans's background and lack of criminal history, along with other relevant sentencing factors. Justifying the sentence, the court wrote:

> The court finds this to be a reasonable sentence in view of the nature and circumstances of the offense entailing the defendant's participation in a large-scale drug trafficking conspiracy involving more than 1,000 kilograms of marijuana, his leadership role in the drug trafficking organization, his distribution of multiple kilogram quantities of marijuana that was imported from Mexico by the organization, his arrangement to take a controlled delivery of $24,000 in drug proceeds and to sell 24 pounds of marijuana to a confidential source which led to his arrest, the seizure of a firearm and a nearby drug ledger during a search of his residence, his operation of a stash house on behalf of the organization, his criminal history including prior convictions for burglary, criminal mischief, driving with a suspended license, possession of marijuana, and dealing in marijuana, his failure to comply with previous terms of probation, and his history of substance abuse. It will serve as just punishment, promote respect for the law, and deter future violations of the law.

And although Pieper's sentence of 145 months is significantly shorter than Romans's, Pieper and Romans are not similarly situated: Pieper pleaded guilty to conspiracy charges and assisted the prosecution. Because Romans has failed to overcome the presumption that his within-guidelines sentence was unreasonable, we must reject his challenge.

## E.

Finally, Romans argues that his sentence constitutes cruel and unusual punishment and violates the Eighth Amendment. A sentence may violate the constitution because it is "inherently barbaric" or because it is

"disproportionate to the crime." *Graham v. Florida*, 560 U.S. 48, 59 (2010), *as modified* (July 6, 2010). "The concept of proportionality is central to the Eighth Amendment. Embodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" *Id.* (quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)). However, Supreme Court precedent demonstrates that it is difficult for a defendant to demonstrate a lack of proportionality in challenges to the length of term-of-years sentences. *See, e.g.*, *Ewing v. California*, 538 U.S. 11 (2003) (rejecting a challenge to a sentence of 25 years to life for the theft of a golf clubs under California's "three-strikes" recidivist sentencing scheme); *Harmelin v. Michigan*, 501 U.S. 957 (1991) (rejecting a challenge to a sentence of life in prison without possibility of parole for possession of over 650 grams of cocaine).

In *Harmelin*, Justice Kennedy's controlling opinion concluded that the Eighth Amendment contains a "narrow proportionality principle," that "does not require strict proportionality between crime and sentence" but rather "forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id.* at 997, 1000-1001 (Kennedy, J., concurring in part and concurring in judgment). In this case, Romans was found responsible for at least 10,000 kilograms but less than 30,000 kilograms of marijuana. He was also found to have operated a stash house, possessed firearms in connection with his drug trafficking, and eventually become an organizer in this conspiracy. In light of Supreme Court precedent, we cannot find that his sentence is so grossly disproportionate as to violate the Eighth Amendment. *See Ewing*, 538 U.S. at 30-31; *Harmelin*, 501 U.S. at 1005; *Hutto v. Davis*, 454 U.S. 370, (1982) (*per curiam*) (rejecting a challenge to a sentence of 40 years for possession with intent to distribute less than nine ounces of marijuana).

VII.

In sum, we conclude that venue was proper with respect to the convictions of all Appellants. We AFFIRM the convictions of all Appellants and AFFIRM the sentences of Appellants Booker, Harden, and Romans. Because the application of the § 2D1.1(b)(1) enhancement to Appellant Moseby's sentence was clearly erroneous, we VACATE Moseby's sentence and REMAND for resentencing.

No. 13-40219

GREGG COSTA, Circuit Judge, specially concurring:

I fully join the majority opinion, which faithfully applies conspiracy case law interpreting the constitutional guarantee that an accused shall be tried "by an impartial jury of the state and district wherein the crime shall have been committed."  U.S. CONST. AMEND. VI.  That precedent dates back more than a century to the Supreme Court's decision in *Hyde v. United States*, 225 U.S. 347 (1912).[1]  That case was decided in an age with far more primitive interstate travel and far less expansive federal criminal law than today, yet Justice Holmes in dissent was able to foresee a case like this one:

> Obviously the use of this fiction or form of words must not be pushed to such a point in the administration of the national law as to transgress the requirement of the Constitution that the trial of crimes shall be held in the state and district where the crimes shall have been committed. Art. 3, § 2, cl. 3. Amendments, art. 6. With the country extending from ocean to ocean, this requirement is even more important now than it was a hundred years ago, and must be enforced in letter and spirit if we are to make impossible hardships amounting to grievous wrongs. In the case of conspiracy the danger is conspicuously brought out.  Every overt act done in aid of it, of course, is attributed to the conspirators; and if that means that the conspiracy is present as such wherever any overt act is done, it might be at the choice of the government to prosecute in any one of twenty states in none of which the conspirators had been.

*Id.* at 386–87.

---

[1] *Hyde* would not have supported venue in this case because its reasoning that venue exists anywhere a conspirator acts was based on an overt act being an element of the general federal conspiracy statute it considered.  *Id.* at 356–58.  The drug conspiracy statute (21 U.S.C. § 846) does not require an overt act.  *See United States v. Shabani*, 513 U.S. 10, 17 (1994).  But in the years following *Hyde*, the Supreme Court extended its venue holding to conspiracy statutes like the current drug one that do not require an overt act.  *See Whitfield v. United* States, 543 U.S. 209, 218 (2005) ("[T]his Court has long held that venue is proper in any district in which an overt act in furtherance of the conspiracy was committed, even where an overt act is not a required element of the conspiracy offense." (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940); *United States v. Trenton Potteries Co.*, 273 U.S. 392, 402–04 (1927))).

32

No. 13-40219

Although not reaching the twenty states of Holmes's prediction, Zigler's and Michael Piper's drives from Indianapolis to the Dallas-Fort Worth metropolex created venue in this drug conspiracy case in seven districts other than the one where the drugs were being sold.[2]  Prosecuting the case in one of those "just passing through" districts, one located close to a thousand miles away from where the drugs were sold, illustrates the concerns about the vitality of the vicinage right that Holmes identified.  That right does not receive much attention these days, but was important enough to the Founders that it—rather than the right to confront witnesses, or the right against self-incrimination, or even the right to due process—along with the related right to trial by jury are the only rules of criminal procedure included in both the original Constitution and Bill of Rights.  *See generally United States v. Cabrales*, 524 U.S. 1, 6 (1998) ("Proper venue in criminal proceedings was a matter of concern to the Nation's founders."); Steven A. Engel, *The Public's Vicinage Right: A Constitutional Argument*, 75 N.Y.U. L. REV. 1658, 1680–91 (2000) (chronicling the history of the vicinage right).  The "structural" Article III Venue Clause and the Sixth Amendment that is framed in terms of a defendant's right serve both "the community's interest in law enforcement as well as the defendant's right to a fair trial."  Engel at 1681.

It undermines both of these concerns to try members of a large-scale Indianapolis drug ring, with life sentences on the line, in Sherman, Texas (population 39,943).  The great leeway *Hyde* gives federal agents to shop cases to the United States Attorney's Office with the lowest thresholds for prosecuting cases implicates the Founder's "fear that in the absence of the

---

[2] Assuming the most direct route using interstate highways, venue was created in the following in order of the route: the Central and Southern Districts of Illinois; the Eastern District of Missouri; the Eastern and Western Districts of Arkansas; and the Eastern and Northern Districts of Texas.

vicinage right, the government might select the community that would be most prone to convict the defendant."[3]  *Id.* at 1695; *see also id.* at 1695 n.195 (citing Patrick Henry's concern at the Virginia Ratifying Convention that without adding a locality requirement to the Article III Venue Clause's state requirement, the government might transport a defendant "from one extremity of the state to another").  And jurors from Indianapolis, not east Texas, should be deciding a case involving tens of millions of dollars in drug transactions in their community.  *See Taylor v. Louisiana*, 419 U.S. 522, 530 (1975) ("Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system."); Akhil Reed Amar, THE BILL OF RIGHTS 88–89 (1998) (explaining that the vicinage right sought to ensure that "the jury would be composed of citizens from the same community, and its actions were expected to be informed by community values"); *cf.* William J. Stuntz, THE COLLAPSE OF AMERICAN CRIMINAL JUSTICE 141–42 (2011) (identifying decreased local involvement in law enforcement, including less localized jury selection, as a failing of the modern criminal justice system).

Despite the prescience of Justice Holmes's dissent, the *Hyde* rule is longstanding and there have been no indications it will be reconsidered. Judges' decisions are not, however, the only source for expressing important principles of our criminal justice system.  Prosecutorial discretion also plays a part as demonstrated by another area of law in which the courts have read a constitutional right narrowly.  Although the Supreme Court has interpreted

---

[3] Given the countless crimes that could be charged at the federal level, U.S. Attorney's Offices typically have thresholds that guide their determination of whether there is a sufficient federal interest to warrant federal prosecution.  The thresholds might involve drug quantity for drug cases, loss amount for fraud cases, number of images in child pornography cases, etc.  The thresholds can vary significantly among different districts.

No. 13-40219

the Double Jeopardy Clause to allow different sovereigns to prosecute the same conduct,[4] the Department of Justice's Petite Policy substantially constrains federal prosecutors' ability to do so. *See* UNITED STATES ATTORNEY'S MANUAL § 9-2.031 (requiring approval from an Assistant Attorney General to pursue a federal prosecution after a prior state prosecution for the same conduct and listing various factors that should be considered in determining whether the presumption against such prosecutions has been overcome). Something similar would help ensure that conspiracy cases are being prosecuted in communities that have a meaningful connection to the case.

---

[4] As is the case for many rules of criminal procedure, Prohibition gave rise to one of the early cases announcing the "dual sovereign" doctrine that allows both federal and state prosecutions for the same conduct. *See United States v. Lanza*, 260 U.S. 377, 382 (1922) (allowing a federal prosecution for the sale of liquor after a conviction for the same in Washington state). That same year, the doctrine also allowed Massachusetts authorities to try the original Ponzi schemer after the feds had already obtained a conviction. *See Ponzi v. Fessenden*, 258 U.S. 254, 261 (1922). The doctrine is much criticized. *See Bartkus v. Illinois*, 359 U.S. 121, 150 (1959) (Black, J., dissenting); David Bryan Owsley, Note, *Accepting the Dual Sovereignty Exception to Double Jeopardy: A Hard Case Study*, 81 WASH. U. L.Q. 765, 767 n.8 (2003) (listing numerous examples of the "almost uniform[]" criticism from academics).