# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 23, 2011

No. 09-40658

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JAIME AGUILAR,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas,

Before DAVIS, CLEMENT, and ELROD, Circuit Judges.

DAVIS, Circuit Judge:

In this direct criminal appeal, Defendant-Appellant Jaime Aguilar was convicted following an adverse jury verdict of conspiracy to possess with intent to distribute over 100 kilograms of marijuana and possession with intent to distribute over 100 kilograms of marijuana. We conclude that the prosecutor's improper closing argument deprived Aguilar of a fair trial. We therefore vacate the conviction and remand for a new trial.

## I. Facts and Proceedings

Aguilar worked as an ambulance driver and certified emergency medical technician (EMT) for Guardian EMS. On October 16, 2008, he arrived at the border checkpoint on Highway 77 in Sarita, Texas, wearing his uniform and

No. 09-40658

driving a company ambulance. His passenger, Diaz-Alonzo, was also in uniform. Aguilar told the Border Patrol agent that they were going to Driscoll Children's Hospital in Corpus Christi, Texas, to pick up a patient. When a drug dog alerted to the ambulance, it was referred to secondary inspection, where an agent found that the back panel of a seemingly locked compartment gave way to reveal 388 pounds of marijuana. Aguilar and Diaz-Alonso were arrested, and Drug Enforcement Administration (DEA) Agents Vincent and Minnick questioned them.

Aguilar told the agents that Guardian's owner, Jorge Pena, had assigned him to transport a patient and informed him that he would be working with Diaz-Alonso, a new attendant. Aguilar met Pena and Diaz-Alonso at the ambulance and received instructions to go to Driscoll Children's Hospital and pick up a patient Aguilar had transported in the past. After Aguilar checked the ambulance and filled out the equipment checklist, he and Diaz-Alonso headed for Corpus Christi.

Agent Vincent called Driscoll Children's Hospital and discovered that the patient was not at the hospital. Vincent testified that when he confronted Aguilar with the conflicting information, Aguilar became very emotional and confessed. He told the agent that Pena told him (Aguilar) that he would be carrying "something" in the ambulance and instructed him to "pretend like nothing was in there." Vincent testified that Aguilar admitted that he knew "mota" (marijuana) was in the ambulance and that Pena planned to drive a parallel route through the Falfurrias checkpoint and switch ambulances with Aguilar and Diaz-Alonso after they went through the Sarita checkpoint. Agent Vincent also testified that Aguilar said he was going to be "highly compensated"

No. 09-40658

and that he needed the money because his mother had medical problems. There was no recording of Aguilar's interview, and he did not sign a written statement.

The Government presented evidence that suggested the ambulance was not actually outfitted for a patient pick up as Aguilar claimed. This evidence will be discussed below in more detail. Aguilar testified and maintained that he had not confessed–the officers misunderstood him when he said that if he were a drug dealer, he would be well compensated and able to afford insurance for his mother.

Agent Minnick, a rebuttal witness for the Government, testified that she was with Agent Vincent when Aguilar confessed, and she confirmed Agent Vincent's version of the confession.

## II. Prosecutorial Misconduct

Aguilar argues that the prosecutor improperly bolstered or vouched for the testimony of Agents Vincent and Minnick during (1) the Government's direct examination of the agents and (2) the Government's rebuttal closing argument and that the district court committed plain error in allowing the examination and argument. We discuss these arguments below.

Aguilar argues first that the direct examination of Agent Vincent was improper because the prosecutor bolstered Agent Vincent's credibility by engaging in a line of questioning tending to establish that Agent Vincent had no motive to testify falsely. Agent Vincent made it clear that false testimony would not advance his career and that he would be prosecuted and fired if he lied in court. Aguilar argues that this error was compounded when the prosecutor elicited testimony from Agent Minnick that Agent Vincent was honest, hardworking, and ethical. According to Aguilar, the testimony the prosecutor

3

No. 09-40658

elicited from Agent Minnick strongly suggested to the jury that the prosecutor and Agent Minnick were personally endorsing Agent Vincent's testimony as truthful.

Aguilar also argues that the prosecutor improperly bolstered the credibility of Agents Vincent and Minnick in the rebuttal portion of his closing argument. Aguilar complains about the following portions of that argument:

> The witnesses testified, both agents testified that there was no way they were mistaken. This is not a case of any chance of being mistaken. The only way that this could not, that he could not have said that, that he could be not guilty, is if they're not telling the truth.
>
> Now, if you're going to find they're not telling the truth, that would be an alarming thing, I think you'll agree. That would be something that we would, we should be very upset about. But if you're going to find that, base it on evidence. Okay? What evidence is there? Not the fact that he cried a lot, crocodile tears, but on evidence.
>
> Is there any point in them lying? Why would the agents do that? Why? They don't know him. They've got nothing to gain. They're risking their careers. They risk going to jail. For what? A person they don't even know? With a medium-sized load of drugs? What's the point in that?
>
> The Defense attorney talks about this is a sad deal, a sad deal for Mr. Aguilar. Well, I agree with him it's a sad deal, but it's not a sad deal for Mr. Aguilar. It's a sad deal for this man right here and Ms. Minnick, people who go out there every day and do their job, that strive to be ethical. They strive to protect people like you and me. They put their life on the line, protecting us and our kids. And what do they get for it? They get to come into the courtroom and be called a liar. That's what they get for it. Big pat on the back, huh?
>
> I submit to you, you know what the right thing to do here is, and I know you're going to do it.

4

No. 09-40658

## *A. Standard of Review*

Aguilar's trial counsel did not object to the prosecutor's comments, so we review for plain error.[1]  To demonstrate reversible plain error, Aguilar must show that (1) there was error, i.e., the prosecutor's remarks were improper, (2) the error was plain and obvious, and (3) the error affected his substantial rights.[2] Even if Aguilar "could meet that burden, we still would have [the] discretion to decide whether to reverse, which we generally will not do unless the plain error seriously affected the fairness, integrity, or public reputation of the judicial proceeding."[3]  We examine each of these requirements below.

## *B. Propriety of the Prosecutor's Conduct*

With respect to the defendant's argument that the prosecutor's direct examination of Agents Vincent and Minnick improperly bolstered their testimony, the Government maintains that the questioning was proper because the prosecutor did not give a personal opinion about their veracity.[4]  When we consider the examination in light of the context in which it was conducted,  we agree with the Government that the examination was not improper.  During opening statements, the defense told the jury that "the evidence is going to show [Aguilar] denied knowledge the whole time, unlike what the agents are going to come here and say."  To rebut this suggestion that the agents would lie, the

---

[1] *United States v. Gracia*, 522 F.3d 597, 599-600 (5th Cir. 2008).

[2] *See id.* at 600.

[3] *Id.*

[4] *See id.* at 602 (finding it improper for a prosecutor to assert "his own credibility, or that of the government, to bolster the credibility of a witness").

No. 09-40658

prosecutor was entitled to present evidence tending to show that Vincent had no motive to lie. Vincent's testimony that it would not benefit him or his career if the person he arrested was convicted was permissible to make this point. The prosecutor also asked what would happen if he lied in court, and Vincent replied that he would be pursued for perjury and fired. This testimony was proper to make the same point. When the defense suggests that a witness will lie, the Government is entitled to show that the witness has no motive to lie.[5]

Aguilar also argues that the prosecutor improperly bolstered the agents' credibility during the rebuttal portion of his closing argument (1) by telling jurors that lying would jeopardize the agents' careers and (2) by making an improper emotional appeal that the agents would not lie because of their status as agents.

The prosecutor in *United States v. McCann* stated in his closing argument that the officers would not risk their lives and careers by lying in court.[6] We held that this was not error because the prosecutor simply referred to facts an officer had testified to during trial.[7] During his closing argument, the defense counsel in *McCann* asserted that the police officers would not face any charges or other repercussions if they committed perjury.[8] In rebuttal, the prosecutor

---

[5] *See United States v. McCann*, 613 F.3d 486, 495-96 (5th Cir. 2010) (The prosecutor in *McCann* elicited testimony from a police officer that he (the officer) would be prosecuted for perjury and fired if he lied under oath. This testimony was elicited to respond to defense's assertions that the officers would lie.); *United States v. Garcia-Gracia*, 324 F. App'x 286, 295 (5th Cir. 2009) (unpublished).

[6] *McCann*, 613 F.3d at 494.

[7] *Id.* at 495-96.

[8] *Id.* at 497-98.

No. 09-40658

argued that there was a need "to apologize to NOPD officers who wear bulletproof vests because they have to worry about getting shot at on the street and then they come in here in court and they get shot at again . . . they get call[ed] liars."[9] This comment was found improper because it was an emotional appeal to bolster the officers' credibility by suggesting that the agents would not lie because they are government agents.[10]

Because Aguilar's counsel asserted that Agents Vincent and Minnick were either lying or mistaken, the prosecutor was entitled to rebut the assertion.[11] However, the prosecutor also had a responsibility not to go beyond the evidence and to make his comments appropriate in scale.[12] On direct examination, Agent Vincent had testified that he would likely be prosecuted for perjury and fired if he lied on the stand. Therefore, the prosecutor's rhetorical question about whether the agents would risk their careers, like that asked in *McCann*, did not go beyond the evidence. However, the comment about Agents Vincent and Minnick getting a sad deal when they "go out there every day and do their job . . . . They strive to protect people like you and me. They put their life on the line, protecting us and our kids. And what do they get for it? They get to come into the courtroom and be called a liar," crossed the line. This argument is indistinguishable from the improper comment in *McCann* in which the prosecutor said that there was a need to apologize to officers who risked their

---

[9] *Id.* at 494.

[10] *Id.* at 496.

[11] *See id.* at 495.

[12] *United States v. Ramirez-Velasquez*, 322 F.3d 868, 874-75 (5th Cir. 2003) (citing *United States v. Young*, 470 U.S. 1, 12-13 (1985)).

No. 09-40658

lives and then were called liars in court.[13]  This "was a largely emotional appeal to the jury to credit the arresting officers' testimony because they were police officers."[14]  Similarly, the comment by the prosecutor in Aguilar's trial was an improper emotional appeal that transmitted the message that the agents' testimony should be believed because they were agents.

This error was also clear and obvious.  As a recent panel of this court observed, "the government has been cautioned repeatedly by this court against making such arguments, yet we continue to face them on appeal."[15]  By now, the rules against bolstering should be clear to the Government.  The prosecutor in this case, in a rapid series of comments, referred to the agents' positions as government agents, then said it would be alarming if they were lying, they were just doing their jobs, and they strive to be ethical.[16]  He then followed up with

---

[13]  *See* 613 F.3d at 494.

[14]  *Id.* at 496 (citing *Gracia*, 522 F.3d at 601).

[15]  *United States v. Raney*, 633 F.3d 385, 395 (5th Cir. 2011) (per curiam); *see also McCann*, 614 F.3d at 496 (finding it improper to make an emotional appeal to credit officers' testimony because they are officers); *United States v. Pittman*, 401 F. App'x 895, 899 (5th Cir. 2010) (unpublished) (finding improper bolstering where prosecutor stated that agents were "just doing their job" and had no motive to lie); *Gracia*, 522 F.3d at 600-02 (finding it improper for a prosecutor to rhetorically ask a jury whether agents would risk their careers by committing perjury); *Ramirez-Valesquez*, 322 F.3d at 873-74 (finding improper the prosecutor's rhetorical question as to whether the officers had a reason to lie and throw away their careers); *United States v. Gallardo-Trapero*, 185 F.3d 307, 319-21 (5th Cir. 1999) (finding it improper to invoke "the aegis of a governmental imprimatur" to bolster witness credibility); *United States v. Crooks*, 83 F.3d 103, 107 n. 15 (5th Cir. 1996) (finding it improper to make appeal to passion or prejudice if calculated to inflame).

[16]  Although Minnick had testified that Vincent was ethical, the prosecutor went beyond that evidence by offering his own opinion that both officers "strive to be ethical" and were just doing their jobs.  We commented on a similar series of inappropriate remarks in *Gracia*, noting that the cumulative effect was particularly problematic.  522 F.3d at 600-03.

No. 09-40658

the emotional appeal that the agents risk their lives for "us and our children" and that it is a "sad deal" for them to be called liars. These remarks constituted clear error because they improperly bolstered the credibility of the government agents and cannot be excused as "mere rebuttal."[17]

### C. Substantial Rights Analysis

The panel must next determine whether the error affected Aguilar's substantial rights.[18] This is a high bar, and the determinative question is "whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict."[19] To determine whether the outcome was affected, we consider three factors: (1) the magnitude of the statement's prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the inculpatory evidence other than the improperly bolstered testimony.[20]

### 1. Magnitude of prejudice.

As we discuss in more detail below, the only significant evidence the government produced to show that Aguilar knew he was transporting marijuana was Aguilar's oral confession testified to by Agents Vincent and Minnick. Because the agents' testimony and their credibility were so critical, the prosecutor's improper bolstering of their credibility renders the prejudice high on the magnitude scale. Significantly, there was no improper argument by the

---

[17] *See id.* at 601-03; *Pittman*, 401 F. App'x at 899 (noting that the prosecutor's remarks, including his remark that the agents were just doing their jobs, went too far).

[18] *See Gracia*, 522 F.3d at 603.

[19] *Id.*

[20] *McCann*, 613 F.3d at 496 (quoting *Gallardo-Trapero*, 185 F.3d at 320).

No. 09-40658

defense, as there was in *McCann*, to counterbalance the prosecutor's misconduct.[21]

*2. Cautionary jury instructions.*

Although cautionary jury instructions can "purge the taint of a prosecutor's prejudicial comments," general instructions only moderately reduce the degree of prejudice of highly improper remarks.[22] During defense counsel's closing argument, the district court informed the jury that "the remarks of the attorneys are not evidence." The district court gave no such instruction following the prosecutor's improper comments, but it did give the boilerplate general instructions to the jury during the charge. We observed in *McCann* that such generic instructions only moderately reduce any prejudice, and we find that the generic instructions in this case failed to compensate for the error.

*3. Strength of the inculpatory evidence.*

In cases where the other inculpatory evidence is strong, a prosecutor's improper bolstering of witness credibility is unlikely to amount to a substantial violation of the defendant's right to a fair trial.[23] In cases where there is little or no evidence against the defendant apart from the improperly bolstered testimony and where a credibility determination is of crucial importance, this court has reversed and remanded for a new trial.[24]

---

[21] *See id.* at 496-98 (determining that the defense counsel's highly improper conduct in telling jurors that the officers would not be prosecuted if they committed perjury acted as a sufficient counterweight to the prosecutor's improper comments).

[22] *Id.* at 496-97.

[23] *Id.* at 497.

[24] *Gracia*, 522 F.3d at 604-06 (finding reversible plain error where, other than the improperly bolstered testimony from government agents, there was no evidence against the

No. 09-40658

In the instant case, the only significant issue at trial was whether Aguilar knew he was transporting marijuana. There was little inculpatory evidence other than the agents' testimony that Aguilar admitted he knew the marijuana was in the ambulance and that he expected to be well-compensated for transporting it. The Government presented some circumstantial evidence suggesting that Aguilar was aware that the patient-pickup story was a sham to cover up the true purpose of the trip through the checkpoint. The oxygen cylinder was in the wrong place and the regulator was empty, suggesting the ambulance was ill-equipped to transport a sick patient. However, Aguilar presented evidence from other ambulance drivers and a state compliance official that ambulance providers routinely instruct their employees to turn off the regulator in between patients as a safety precaution, thus causing the gauge to read zero even though oxygen is available.

The Government also pointed out discrepancies on the patient order form and equipment checklist, noting the mistake in the mileage, the misspelling of the hospital's name, and Agent Vincent's testimony that there were no blood pressure cuffs in the ambulance. Aguilar admitted that he filled out the checklist that incorrectly reported the mileage, noting that it was 4:30 a.m., but he disputed Vincent's testimony about the absence of blood pressure cuffs, testifying that he personally placed the cuffs in the unit. Aguilar also presented evidence that it was his coworker, Diaz-Alonso, who misspelled the hospital's name.

---

defendant); *United States v. Garza*, 608 F.2d 659, 665-66 (5th Cir. 1979) (finding reversible plain error where the prosecutor improperly bolstered his witnesses and the credibility determination was "perhaps the most important problem facing the jury").

11

No. 09-40658

The Government further argued that Aguilar should have inspected the seemingly locked compartment and discovered the marijuana if he had truly been preparing for a patient transport. Aguilar presented evidence from an EMT and an ambulance services compliance officer for the Texas Department of State Health Services that EMTs were not expected to inspect such compartments because they were for drugs that only paramedics could distribute.

Finally, the Government produced evidence that, consistent with Vincent's version of Aguilar's confession, a Guardian ambulance traveled a parallel route through the Falfurrias checkpoint. However, Aguilar explained in his testimony that Pena called while he and Diaz-Alonso were en route to Driscoll Children's Hospital and informed Diaz-Alonso that he (Pena) would be making a patient pickup in San Antonio. Because a trip to San Antonio would require Pena to travel through the Falfurrias checkpoint, the evidence that Aguilar believed another Guardian ambulance traveled that route for a legitimate purpose undermines the government's argument on this point.

Except for the defendant's alleged confession, the above evidence is the only evidence the Government points to that supports the jury's implicit finding that Aguilar knew he was transporting marijuana. We do not find this circumstantial evidence of Aguilar's guilty knowledge persuasive when considered in light of Aguilar's explanations. The Government produced no evidence that Aguilar was nervous at the checkpoint or that he gave contradictory answers regarding his point of origin and destination or other details of his trip, which are typical indicators of guilty knowledge by transporters at checkpoints. Aguilar's confession was neither recorded nor

12

No. 09-40658

transcribed, and he vehemently denied ever confessing or having any knowledge of the marijuana. Because there was no significant proof of his knowledge absent the confession, the outcome of the trial depended on whether the jury believed Aguilar on the one hand or Agents Vincent and Minnick on the other.[25]

In summary, we find the prosecutor's rebuttal argument grossly improper and indistinguishable from similar arguments we have found improper and the subject of repeated warnings.[26] We therefore find the error clear and obvious and, given the critical role of the credibility of the agents in the determination of defendant's guilt, we find the error affected Aguilar's substantial rights.

We may exercise our discretion to correct a plain error if it seriously affects the fairness, integrity, or public reputation of the judicial proceedings in light of the record as a whole.[27] Under the circumstances of this case and in light of this court's repeated warnings to prosecutors, we decline to overlook this error. We therefore vacate this conviction and remand for a new trial.

### III. CONCLUSION

We VACATE Aguilar's conviction and REMAND for new trial.[28]

---

[25] This case was tried twice because the first trial ended in a mistrial when the jury was unable to reach a verdict. It is impossible to know what dynamic actually created this result, but it is an indication that this was a close case.

[26] At oral argument, counsel for the Government (who tried the case) assured us that he understood our warnings about improper bolstering. Counsel nevertheless continued to maintain that there was nothing improper about his closing argument.

[27] *Gracia,* 522 F.3d at 600.

[28] Aguilar also argues that the evidence was insufficient to support his conviction because the government failed to prove that he knew the type and quantity of drugs he possessed. He acknowledges that this issue is foreclosed by *United States v. Betancourt*, 586 F.3d 303 (5th Cir. 2009), and he raises this issue to preserve it for review. Based on *Betancourt*, we reject this argument.

No. 09-40658

---

Aguilar also argues that the district court plainly erred in admitting "drug profile" evidence and expert testimony from government agents.  Our disposition of this case makes it unnecessary to reach these issues.