# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-40700

United States Court of Appeals
Fifth Circuit

**FILED**

September 18, 2017

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

WILLIAM EDMUND KIEKOW, also known as William Edward Kiekow, also known as Bill Kiekow, also known as Crack Head Bill; FELIPE U. URIARTE, also known as Phillip; ARTHUR JAMES PIERRE, also known as Phillip, also known as Boss,

      Defendants - Appellants

---

Appeals from the United States District Court
for the Eastern District of Texas

---

Before STEWART, Chief Judge, and JONES and CLEMENT, Circuit Judges.

CARL E. STEWART, Chief Judge:

After a 14-day jury trial, a jury in the Eastern District of Texas convicted Defendants-Appellants William Edmund Kiekow ("Kiekow"), Felipe U. Uriarte ("Uriarte"), and Arthur James Pierre ("Pierre") (collectively, "Appellants") of conspiracy to distribute or possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846.[1]  On appeal, Appellants challenge venue and the sufficiency

---

[1] Count Two of the Third Superseding Indictment alleged Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h). On January 9, 2013, the Government

of the evidence supporting their convictions. Kiekow and Uriarte also challenge their sentences. Pierre moves for a new trial based on a Government witness's post-trial change in testimony and challenges the admission of a drug-sniffing dog alert. Pierre and Uriarte challenge statements made during the Government's closing argument rebuttal.

For the reasons explained herein, we AFFIRM Appellants' convictions and the district court's denial of Pierre's motion for a new trial. As to challenges to the district court's sentencing, we AFFIRM Uriarte's sentence, but will VACATE and REMAND Kiekow's sentence to the district court for resentencing.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This case arises from a longtime federal investigation into drug trafficking from Mexico into the United States.  Appellants were charged in a Third Superseding Indictment for their involvement with the importation and sale of marijuana and cocaine from Mexican cartels, most prominently the Zeta Cartel.  A jury convicted Appellants of conspiring to distribute cocaine, but not marijuana.  Over the 14-day trial, nearly fifty Government witnesses, consisting primarily of alleged co-conspirators-turned-Government cooperators, testified to a far-reaching drug trafficking scheme that began with an individual named Jose Arce working with Miguel Trevino, the then-second-in-command of the Zeta Cartel, and others to ship cocaine into the United States.

Appellants were involved at varying levels of the drug trafficking conspiracy.  The alleged supplier in this case was Uriarte, who owned a tire and rim shop in Houston.  Uriarte's tire shop was located adjacent to Federico

---

filed a motion to dismiss the second count of the Third Superseding Indictment, which the district court granted the following day.

## No. 14-40700

Garcia's trucking company, F&J Transportation. Garcia was the alleged transporter. The alleged customer was Pierre who lived in Picayune, Mississippi. Kiekow, also in Picayune, lived in a trailer located on Pierre's property. Central to this scheme was the cooperation of police officers in Mexico.[2] Rafita Gonzalez ensured that drugs would get from Mier, Mexico into Roma, Mexico.

Once the cocaine arrived, and after Arce and others contacted Garcia, Garcia would send one of his drivers from Houston to Roma to help package the drugs utilizing a three-step process of wrapping the drugs, spraying the wrapped drugs with Lysol, and then taping the drugs. After completing that process, Garcia's drivers filled trucks, typically 18-wheelers, with cocaine and transported the drugs to Laredo, Texas.

Trial testimony elicited from alleged co-conspirators, namely Jorge Gayton, Garcia, Fabian Lara, and Patricio Pena-Martinez, spoke to the breadth of the drug trafficking scheme. Cocaine and marijuana would be delivered from Houston to New York, Tennessee, Illinois, Georgia, Oklahoma, and Picayune. Uriarte's delivery of cocaine to Pierre and Kiekow in Picayune commenced with unloading the drugs at either Garcia's car lot or Uriarte's rim shop. Recounting the process of getting the cocaine to Mississippi, Garcia testified to working alongside Uriarte to hide cocaine in 18-wheeler tires or in a spare tire to a pickup truck.

Edwin Contreras, one of Garcia's trucking employees, testified to making an initial drive to Picayune in 2007 to deliver cocaine to Pierre. After retrieving the cocaine in Houston, he packed the approximately eight to ten kilograms of cocaine into a hidden compartment of a 2003 Chevrolet Malibu, drove down I-

---

[2] For example, Arce testified that he would use his nickname, "Double Zero," if stopped by police officers in Mexico. Upon hearing the nickname, the officers would let him go.

No. 14-40700

10 through Baytown, Beaumont, Louisiana and then entered Picayune to deliver the drugs to Pierre's home. A trailer occupied by Kiekow sat between the driveway and Pierre's home. It was sometimes behind this trailer that the drugs were unloaded into duffel bags and handed to Kiekow.  Contreras made the same trip and delivery four other times, delivering approximately eight to ten kilograms of cocaine each time.

Garcia delivered cocaine to Pierre in Mississippi once or twice a month from 2003 through 2008. Each time Garcia sent between six and fifty kilograms of cocaine, charging $19,000 to $20,000 per kilogram which Pierre paid in cash. When Pierre was not available, Kiekow managed the transaction by collecting the cocaine and tendering payment.

At the close of the Government's evidence, Pierre and Uriarte moved for a judgment of acquittal under Rule 29.  *See* Fed. R. Crim. P. 29(a).  For reasons stated on the record, the district court denied the motions. They renewed the motions after closing arguments and the district court again denied the motions. Kiekow filed a post-verdict motion for judgment of acquittal and the district court denied the motion.

The jury convicted Appellants of conspiring to distribute cocaine, but acquitted them of conspiring to distribute marijuana. Additionally, the jury answered a special interrogatory concerning the "quantity [of cocaine] involved in the conspiracy." In doing so, the jury attributed "5 kilograms or more" of cocaine to Uriarte and "500 grams or more but less than 5 kilograms" of cocaine to Kiekow.

At Kiekow's sentencing in 2014, the district court determined that his total offense level was 32 after applying an enhancement for maintaining a premises for the purpose of manufacturing or distributing a controlled substance.  *See* U.S.S.G. § 2D1.1(b)(12).  Accordingly, his Sentencing Guidelines range was 121-151 months.  The district court sentenced him to 121

4

months' imprisonment. At Uriarte's sentencing in 2016, the district court acknowledged that although Kiekow received an enhancement for maintaining a premises for the purpose of manufacturing or distributing a controlled substance, the court would not apply the enhancement to Uriarte's sentence given the parties' agreement that imposition of the enhancement potentially implicated a violation of the *Ex Post Facto* clause. The district court determined that Uriarte's total offense level was 41 after applying a three-level enhancement for being a manager or supervisor in criminal activity that involved five or more participants or was otherwise extensive. *See* U.S.S.G. § 3B1.1(b). The district court sentenced Uriarte to 300 months' imprisonment.

## II.    DISCUSSION

Appellants raise a number of issues on appeal. Before turning to the evidentiary issues, sentencing challenges, and Pierre's motion for a new trial, we will address challenges common to all Appellants: venue and sufficiency of the evidence.

### A. Venue

Appellants contend that the Government failed to present sufficient evidence to establish that venue was proper in the Eastern District of Texas. The gravamen of their argument is that venue was improper because the entire testimony centered on drug activity in Mississippi, Louisiana, and Houston— none of which are located in the Eastern District of Texas.  Kiekow, relying primarily on this court's decision in *United States v. Strain* 396 F.3d 689 (5th Cir. 2005), argues that without proof that he committed at least some part of the offense in the Eastern District of Texas, venue is not proper. Because

No. 14-40700

Kiekow and Pierre preserved the issue below, we review the district court's ruling de novo.[3]

"A defendant's right to be tried in the district in which the crime [allegedly] took place finds its roots in both the Constitution and federal statutory law." *United States v. Carreon–Palacio*, 267 F.3d 381, 390 (5th Cir. 2001). This court "will affirm a verdict if, viewing all the evidence in the light most favorable to the government, a rational jury could conclude, from the evidence presented at trial, that the government established venue by a preponderance of the evidence." *United States v. Garcia Mendoza*, 587 F.3d 682, 686 (5th Cir. 2009). Clarifying the contours of venue in multi-district crimes, 18 U.S.C. § 3237(a) provides that "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). "In conspiracy cases, venue is proper in any district where the agreement was formed or an overt act occurred." *United States v. Romans*, 823 F.3d 299, 309–

---

[3] Although Appellants Kiekow and Pierre properly preserved their venue challenge in the district court, Uriarte waived his right to contest venue on appeal by not raising the issue before trial or during his Rule 29 motion for judgment for acquittal. *See United States v. Carreon–Palacio*, 267 F.3d 381, 392–93 (5th Cir. 2001); *see also United States v. Rodriguez–Lopez*, 756 F.3d 422, 430 (5th Cir. 2014) ("A defendant waives his right to contest venue on appeal, however, when his motion for acquittal [at the close of the Government's evidence] fails to put the court and the United States on notice of the challenge to venue."). This circuit's precedent post-*Carreon* looks to the circumstances of when the party was on notice that venue was deficient, but nonetheless requires a clear invocation of a challenge to venue. *See, e.g.*, *U.S. v. Isgar*, 739 F.3d 829, 838 n.27 (5th Cir. 2014) (concluding that, despite a defendant's right to challenge venue "at the close of the government's case" when it is only then that "the impropriety of venue [] becomes apparent," the defendant waived his challenge to venue by "fail[ing] to rais[e] any venue issue" during his Rule 29 motion) (quoting *Carreon–Palacio*, 267 F.3d at 392–93). Although the Third Superseding Indictment included adequate allegations concerning the Eastern District of Texas, we conclude that Uriarte had notice of venue deficiencies before trial, particularly considering the motions filed on this issue by his co-defendants. Regardless, his generic Rule 29 motion did not put the district court and the Government on notice that he was challenging venue. Notwithstanding his waiver, Uriarte's claim fails for the same reasons as his co-conspirators, explained more fully *infra*.

10 (5th Cir. 2016) (internal quotations and citation omitted). An overt act is an act performed to effect the object of a conspiracy. *Id.* at 310. The transportation of drugs and drug proceeds is an overt act. *See id.*

The Government presented ample evidence to establish venue. Contrary to Appellants' contentions, evidence demonstrated that travel through the Eastern District of Texas was essential—not incidental—to the alleged drug trafficking scheme.[4] For example, alleged co-conspirator Contreras testified that he picked up cocaine in Houston and delivered eight kilograms of cocaine to Pierre in Picayune. To get there, Contreras testified to going "down I-10…past Beaumont." In all, Contreras testified that he made this trip four times to deliver between eight and ten kilograms of cocaine to Pierre and Kiekow. Gayton, Garcia's brother-in-law and employee, testified that he transported ten to twenty kilograms of cocaine between seven and ten times through Beaumont to Picayune where he would deliver some portion of that haul to Pierre and Kiekow. Garcia also testified that he transported cocaine from Houston to Pierre in Picayune at Uriarte's behest.

Drug trafficking necessarily touches various districts, thus presenting the potential for forum shopping by prosecutors. *See, e.g.*, *Romans*, 823 F.3d at 325 (Costa, J., concurring) (recognizing that "just passing through" travel from Indianapolis to Dallas created venue in seven districts other than the district where the drugs were ultimately sold). This reality does not, however, obviate the very real contact that this drug trafficking scheme had with the Eastern District of Texas based upon these facts. It is not fatal to venue that these co-conspirators were not ultimately arrested or did not complete transactions in the Eastern District of Texas. *See Garcia Mendoza*, 587 F.3d at 686. As this

---

[4] The Eastern District of Texas is comprised of the cities of Beaumont, Lufkin, Marshall, Sherman, Texarkana, and Tyler.

court's decisions in *Romans* and *Garcia Mendoza* make abundantly clear, the meaningful act of transporting drugs across the interstate is not merely a preparatory act to a conspiracy to distribute drugs. *See Romans*, 823 F.3d at 310–11; *Garcia Mendoza*, 587 F.3d at 686. Consistent and repeated travel of 18-wheelers and other vehicles filled to the brim with drugs through the Eastern District of Texas is sufficient to establish venue.

That the Government did not produce tangible evidence—*i.e.*, maps or a traffic citation as in *Romans*—does not require this court to disregard common sense. The testimony of the alleged co-conspirators that travel from Houston to Picayune, connected via Interstate 10, took them through the Eastern District of Texas is commonsensical. The distance between Houston and Picayune using I-10 is less than 400 miles and the route passes directly through the Eastern District. "Traveling from [Houston] to [Picayune] without passing through the Eastern District would be a quixotic endeavor for anyone, much less drug traffickers facing innumerable risks of apprehension." *Garcia Mendoza*, 587 F.3d at 686. Further, it is of no occasion that Appellants' alleged co-conspirators, rather than Appellants, maintained this travel. As this court reminds alleged drug trafficking conspirators regularly, "travel through [the Eastern District] in furtherance of the crime alleged establishes venue as to all co-conspirators." *Id.* at 687.

Thus, under the *Romans* and *Garcia Mendoza* principle, we hold that "a rational jury could conclude . . . that the Government established venue by a preponderance of the evidence." *Garcia Mendoza*, 587 F.3d at 686.

### B. Sufficiency of the Evidence

Appellants next challenge the sufficiency of the Government's evidence to support the jury's verdict that they entered into a conspiracy to distribute or possess with intent to distribute cocaine. Appellants' sufficiency challenges lack merit.

8

No. 14-40700

Because Appellants properly preserved their claim, the court reviews *de novo* their challenge to the sufficiency of the evidence. *See United States v. Umawa Oke Imo*, 739 F.3d 228, 235 (5th Cir. 2014). "When reviewing the sufficiency of the evidence, a court must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotations and citation omitted). The court must view the evidence and all reasonable inferences in the light most favorable to the verdict. *Id.*

"To establish a conspiracy to distribute a controlled substance, the Government must prove the following beyond a reasonable doubt: (1) the existence of an agreement between two or more individuals to distribute cocaine; (2) the defendant's knowledge of the agreement; and (3) their voluntary participation in the conspiracy." *United States v. Olguin*, 643 F.3d 384, 393 (5th Cir. 2011). "The jury can infer a conspiracy from circumstantial evidence," and, although a defendant's "presence alone is insufficient to establish a conspiracy," the jury "may rely on the defendant's presence and association" as factors in finding that a conspiracy existed. *See id.* at 393–94.

Because each Appellant utilized numerous aliases, it was not uncommon for witnesses to use those aliases interchangeably in their testimony: Uriarte is sometimes referred to as "Felipe," "Phillip," or "Llanta,"[5] Pierre is sometimes referred to as "Arthur" (his first name) or "Boss," and Kiekow is sometimes referred to as "Bill." We address the evidence against each Appellant in turn.

*i. Uriarte*

No fewer than five Government witnesses tied Uriarte to each aspect of the alleged drug operation. Pena-Martinez established how Uriarte obtained cocaine. Pena-Martinez testified that he was tasked with distributing drugs

---

[5] Llanta is a Spanish word that translates to "tire" in English.

to a person known as "Llanta." "Llanta" was identified as Uriarte. Pena-Martinez thereafter "called him and [] delivered drugs to him." In total, he delivered cocaine "five times" to Uriarte's tire shop, amounting to sixty or seventy kilograms of cocaine. Garcia and his drivers described how Uriarte directed transportation of the cocaine. Garcia testified that he ran the trucking operation that transported the cocaine to Pierre. As he explained it, "Uriarte used tires for transportation" of cocaine. Garcia and Uriarte would sometimes place cocaine "in the 18-wheeler tires, in the spare tire or in a spare tire to a pickup truck, to transport it." In the same vein, Gaytan, one of Garcia's drivers, testified he took approximately seven to ten loads of cocaine from Uriarte to Mississippi, and each load was between ten and twenty kilograms. Finally, witnesses testified that Uriarte was involved in the profits of the enterprise. Garcia testified that "[i]f Philip [Uriarte] gave me the kilos of cocaine, that's who I would share the profits [with]."

The Government also put on evidence demonstrating that Uriarte's tire shop customers paid him $151,307.61 in cash over three years, but Uriarte deposited $1,107,475.00 into his bank account during the same period—leaving $956,167.39 in unexplained cash.

*ii. Pierre (or "Boss")*

The testimony against Pierre was similarly strong. Garcia set the stage for how he became involved with Pierre, testifying that he first met a "customer" known as "Boss," whose real name, as he later found out, was Arthur Pierre. He testified to delivering eighteen kilograms of cocaine to a hotel where Pierre awaited the delivery for several days. In all, Garcia testified that he and his trucking company delivered cocaine to Pierre once or twice a month from 2003 to 2008, delivering amounts ranging from six to fifty kilograms. Then, "the same vehicle that [ ] would transport the drugs" would bring the proceeds back.

10

No. 14-40700

Garcia's drivers, namely Contreras and Gaytan, testified to the same effect. Contreras explained that, on his first trip, he transported eight kilograms of cocaine from Houston to Pierre's Picayune house. In total, he delivered between eight and ten kilograms four times to Pierre's house. Gaytan's testimony was similar. He took approximately seven to ten loads of cocaine from Uriarte to Mississippi, and each load was between ten and twenty kilograms. Individuals who purchased drugs from Pierre also testified. For example, Demorae Pritchett testified that he bought at least 3 kilograms of cocaine per month from Pierre between 2004 and 2007.

As it did with Uriarte, the Government put on evidence of Pierre's finances. The Government showed that Pierre and his wife earned $247,298.00 over three years, but deposited $785,104.12 into eight bank accounts during the same period.

*iii. Kiekow (or "Bill")*

Finally, the trial testimony showed that Kiekow essentially served as Pierre's right-hand man. Mizett testified that he saw Kiekow on the property each time he visited Pierre's house, Garcia testified that he spoke with nobody at the Picayune house "other than Arthur Pierre and Bill," and Contreras said that "Mr. Bill was there every time I went." To be clear, Kiekow was not a passive bystander. According to Garcia, "[s]everal times when Arthur wasn't there, [he and his delivery partner] would hand [Kiekow] the kilos. Or [Kiekow] would hand [them] the money when Arthur Pierre wasn't around." Contreras testified similarly, stating that he placed the drugs in a duffel bag and "handed them to Mr. Bill[.]" Afterwards, Contreras continued, Kiekow "put [the drugs] up and then he showed us where the money was."

In light of this small glimpse into the trial testimony of nearly 50 Government witnesses, a rational finder of fact could have determined that the Government established beyond a reasonable doubt each element of conspiracy

11

as to each Appellant, namely that they: (1) operated in a way that demonstrated an agreement to violate the narcotics laws; (2) demonstrated clear knowledge of that agreement; and (3) voluntarily participated. *See Olguin*, 643 F.3d at 393.

Viewing the evidence in the light most favorable to the verdict, as this court must, Appellants' challenges to the evidence fails. *Id.* at 394–95.

### C. Sentencing

Kiekow and Uriarte challenge their sentences on a number of grounds. Kiekow argues that the district court erred on two procedural grounds by: (1) improperly calculating the drug quantities that served the basis of relevant conduct; and (2) rejecting his request for a role reduction as a minimal participant. Although Kiekow does not clearly brief this issue, the Government concedes that the district court erred in applying a two-level enhancement in violation of the *Ex Post Facto* Clause. U.S. CONST. art. I, § 9, cl. 3. Uriarte argues that the district court erred on two grounds by: (1) improperly calculating the amount of cocaine that served the basis of relevant conduct; and (2) applying a three-level enhancement for being a manager or supervisor within the conspiracy.

We review "factual findings related to sentencing for clear error." *United States v. Harris*, 740 F.3d 956, 966 (5th Cir. 2014). "Drug quantity determinations are factual determinations," as are determinations of the defendant's role in the crime. *See id.* at 966–67 (citations omitted). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, this court may not reverse, even if, had we been sitting as trier of fact, we might have weighed the evidence differently." *Id.* (internal marks omitted).

No. 14-40700

*i. Kiekow*

Kiekow first claims that his sentence is procedurally unreasonable because "the amount of drug quantities as relevant conduct was improperly calculated."[6]   The jury returned a verdict finding Kiekow responsible for between 500 grams and 5 kilograms of cocaine. Consistent with the jury finding, the PSR stated that "there is evidence that Kiekow is responsible for at least 3.5 kilograms of cocaine."   As a result, Kiekow's base offense level was 30. *See* U.S.S.G. § 2D1.1(c)(5) (2012) (base offense level of 30 for "[a]t least 3.5 KG but less than 5 KG of Cocaine").   Noting the "much larger quantities of cocaine that Mr. Kiekow was responsible for receiving and unloading," the district court agreed and found "by a preponderance of the evidence [that the evidence] is sufficient for Mr. Kiekow to be responsible for, at a minimum, 3.5 kilograms of cocaine."

On appeal, Kiekow argues that his base offense level should have been lower.  In particular, he contends that because only one Government witness testified that he was responsible for an amount of cocaine—one kilogram—that fell within the range of the jury's finding, the court should presume the jury did not convict on testimony that was in excess of three and a half kilograms. If the court accepted the one kilogram limitation, Kiekow would have a base offense level at 26.  *See* U.S.S.G. § 2D1.1(c)(7) (2012).

Kiekow's argument is unavailing.  As the Government correctly notes, when Kiekow made this objection at sentencing, he conceded that the Government offered a significant amount of testimony establishing higher cocaine quantities for which Kiekow was responsible.  Indeed, in overruling Kiekow's objection, the district court stated: "the court finds that there was

---

[6] Kiekow waived his substantive reasonableness challenge to the district court's sentence because he failed to brief this issue. *See United States v. Harrison*, 777 F.3d 227, 236 (5th Cir. 2015).

testimony from at least four coconspirators . . . who implicated Mr. Kiekow and testified to, actually, much larger quantities of cocaine that Mr. Kiekow was responsible for receiving and unloading[.]"   The jury, for reasons unknown, attributed an amount to Kiekow that was considerably smaller than testimony in the case revealed.  Nevertheless, the evidence established that a much larger quantity of cocaine was attributable to Kiekow.

The court reasonably rejected Kiekow's argument, concluding that neither the court nor counsel could speak to the jury's rationale on finding the amount of drugs in the verdict.  That finding was not clearly erroneous.  *See, e.g.*, *United States v. Mares*, 402 F.3d 511, 519 (5th Cir. 2005) ("The sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of a Guideline sentencing range[.]").

Kiekow next argues that he "should have received a role reduction as a minimal participant."  A "minimal participant" is a defendant who is "plainly among the least culpable of those involved in the conduct of a group."  U.S.S.G. § 3B1.2(a) & cmt. n.4 (2012).  A minimal participant is entitled to a four-level reduction.  *Id.*

Kiekow's only support for his minimal-participant argument is that his "role was limited to very little drug activity in Picayune Mississippi." Kiekow's argument fails in the face of this circuit's decision in *United States v. Marmolejo.*  106 F.3d 1213, 1217 (5th Cir. 1997) (holding that "when a sentence is based on activity in which a defendant was actually involved, § 3B1.2 does not require a reduction in the base offense level even though the defendant's activity in a larger conspiracy may have been minor or minimal.") (quoting *United States v. Atanda*, 60 F.3d 196, 199 (5th Cir. 1995)).   Here, as the Government argues, Kiekow's sentence was tied to the cocaine for which Kiekow was responsible, and thus "he cannot now claim to be a minor participant in relation to his offense."  *Marmolejo*, 106 F.3d at 1217.  In light

No. 14-40700

of the jury's finding and the additional evidence of Kiekow's involvement, Kiekow has not carried his burden of showing that he was "plainly" a minimal participant. U.S.S.G. § 3B1.2(a), cmt. n.4. The district court did not clearly err. *See Marmolejo*, 106 F.3d at 1217.

Finally, Kiekow argues that a two-level enhancement violated the *Ex Post Facto* Clause as applied to him. *See* U.S. CONST. art. I, § 9, cl. 3. The PSR used the 2012 Sentencing Guidelines to calculate Kiekow's Guidelines range. The PSR recommended, and the district court adopted, a two-level enhancement for maintaining a premises for the purpose of manufacturing or distributing a controlled substance. *See* U.S.S.G. § 2D1.1(b)(12) (2012). As Kiekow notes, however, this enhancement did not exist during the period of the conspiracy, which ended around 2009.

Because Kiekow did not raise this argument in the district court, plain error review applies. *See United States v. Castillo–Estevez*, 597 F.3d 238, 240 (5th Cir. 2010). To establish plain error, the defendant must demonstrate that: (1) there was error; (2) the error was plain and obvious; (3) the error affected their substantial rights; and (4) the court should exercise its discretion to reverse because the plain error seriously affected the fairness, integrity, or public reputation of the judicial proceeding. *See United States v. Puckett*, 505 F.3d 377, 384 (5th Cir. 2007).

The Supreme Court's decision *Peugh v. United States*, 133 S. Ct. 2072, 2082–84 (2013), establishes that where the wrong Guidelines are consulted and those Guidelines expose a defendant to greater punishment, the district court violates the *Ex Post Facto* Clause. *Id.* at 2084 ("A retrospective increase in the Guidelines range applicable to a defendant creates a sufficient risk of a higher sentence to constitute an ex post facto violation."); *see also, e.g., United States v. Armstead*, 114 F.3d 504, 510 (5th Cir. 1997) ("A sentence that is increased pursuant to an amendment to the guidelines effective after the

15

offense was committed violates the ex post facto clause.") (quoting *United States v. Domino*, 62 F.3d 716, 720 (5th Cir. 1995)). *Cf. United States v. Shakbazyan*, 841 F.3d 286 (5th Cir. 2016) (clarifying that *Peugh* will not save a defendant who commits one of the alleged crimes after the effective date of the Guidelines in question). In light of this precedent, the Government "concedes that the court plainly erred by applying the two-level increase to Kiekow and seeks remand for resentencing in light of this concession."

This circuit's decision in *United States v. Myers* is also instructive. In *Myers*, this circuit concluded that the district court's misapplication of the 2012 Guidelines rather than the 2007 Guidelines resulted in an increased sentencing exposure of 41 to 51 months, thereby affecting the defendant's "substantial rights and offend[ing] the fairness, integrity, or public reputation of judicial proceedings." 772 F.3d 213, 219 (5th Cir. 2014). "[T]he error was plain, obvious, and not subject to reasonable dispute because, in light of *Peugh*, the application of the 2012 Guidelines imposes a more onerous sentence upon [the defendant], clearly implicating a violation of the *Ex Post Facto* Clause." *Id.* (citation omitted).

Here, Kiekow faces a less drastic increase in sentencing exposure, but increased exposure nonetheless. Rather than having an exposure of 97-121 as a level 30 offender, he faced a minimum exposure of 121 months and maximum exposure of 151 months as a level 32 offender. There was plain error, it is clear, and it affected Kiekow's substantial rights "by imposing a significant risk of a higher sentence." *Id.*

The only question, then, is whether the error seriously affects the fairness, integrity, or public reputation of judicial proceedings insomuch that this court should exercise its discretion to correct the error. *See United States v. Prieto*, 801 F.3d 547, 549–50 (5th Cir. 2015). We hold that it does.

The *Myers* decision considered the 41 to 51 month sentence sufficient. As the United States Court of Appeals for the D.C. Circuit straightforwardly explained, however, "[t]he unlawfulness of [a defendant's] sentence necessarily affects the fundamental fairness and integrity of his conviction." *United States v. Sheffield*, 832 F.3d 296, 315 (D.C. Cir. 2016). Unlike circumstances that might justify concluding that the error is harmless, such as where the district court expressly provides on the record that the sentencing decision was not tied to the Guidelines range, the district court here plainly relied upon the erroneously calculated Guidelines. *See U.S. v. Arojojoye*, 753 F.3d 729, 737 (7th Cir. 2014). *Cf. United States v. Martinez-Romero*, 817 F.3d 917, 925–26 ("We . . . conclude that the district court's selection of the bottom of the incorrect guideline range indicates that the improper guideline calculation influenced the sentence.").

Accordingly, we vacate Kiekow's sentence and remand to the district court to sentence him under the 2009 Sentencing Guidelines. This remand does not otherwise limit the district court's sentencing discretion.

We now turn to Uriarte's challenges to his sentence.

*ii. Uriarte*

Like Kiekow, Uriarte claims that the district court erred in calculating the amount of cocaine for which he was responsible. In addition, he argues that the district court erred in applying the manager or supervisor enhancement.

As explained above, we review "factual findings related to sentencing for clear error." *Harris*, 740 F.3d at 966. "Drug quantity determinations are factual determinations," as are determinations of the defendant's role in the crime. *See id.* at 966–67 (citations omitted). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, this court

may not reverse, even if, had we been sitting as a trier of fact, we might have weighed the evidence differently." *Id.* at 967 (internal marks omitted).

As the Government recounts, Garcia testified that he delivered cocaine for Uriarte for about five years, once or twice per month, in amounts ranging from six to fifty kilograms. The district court observed that would total a minimum of 360 kilograms (six kilograms multiplied by twelve months and five years) in total.  In addition, Pena-Martinez testified to delivering sixty to seventy kilograms to Uriarte and seeing fifty-one kilograms being loaded into Uriarte's car.  At a minimum, the district court reasoned, Uriarte "would be responsible for 471 kilograms of cocaine."   Therefore, under the 2009 Sentencing Guidelines,[7] Uriarte's base offense level was 38. U.S.S.G. § 2D1.1(c)(1) (2009) (base offense level of 38 for "150 KG or more of Cocaine").

Uriarte raises several objections in an attempt to void any reliance on Garcia's testimony: (1) Garcia's testimony is unreliable because the jury acquitted Uriarte of the *marijuana* conspiracy to which Garcia testified; (2) Garcia's testimony is unreliable because Garcia could not specify when he delivered cocaine for Uriarte; and (3) Garcia's testimony was unreliable under *Lee v. Illinois*, 476 U.S. 530, 545 (1986), which stated that "a codefendant's confession is presumptively unreliable as to the passages detailing the defendant's conduct or culpability[.]"   To the first point, the jury *convicted* Kiekow of the cocaine conspiracy to which Garcia testified; thus, this argument is misplaced.  As to the specificity of the time period, Garcia, as the district court noted, plainly testified to the 2003–2008 period. Lastly, *Lee* was a Confrontation Clause case, and the Court's statement occurred in context of its

---

[7] Although Uriarte's PSR used the 2012 Sentencing Guidelines, the district court and probation officer agreed at the sentencing hearing to use the 2009 Sentencing Guidelines to avoid the *Ex Post Facto* Clause problem regarding the two-level premises enhancement that Kiekow challenges.

discussion and application of the now-outdated reliability analysis under *Ohio v. Roberts*, 448 U.S. 56 (1980), *abrogated by Crawford v. Washington*, 541 U.S. 36 (2004).  *See Lee v. Illinois*, 476 U.S. at 545. *Lee* thus says nothing about sentencing, much less the testimony on which a sentencing judge may rely.  *Id.* The district court did not clearly err in its cocaine calculation.  *See Harris*, 740 F.3d at 966–67.

Uriarte also argues that "[t]he enhancement for being an organizer/leader should not have applied."  Uriarte's argument misconstrues the appropriate enhancement for his appeal because the district court sustained his objection to the four-level enhancement applicable to an organizer or leader and only applied, as Uriarte's counsel essentially requested, a three-level enhancement applicable to a defendant who is a manager or supervisor.  *See id.* § 3B1.1(b).  Thus, it appears that Uriarte is challenging the three-level enhancement.  Regardless, the challenge is meritless.

The PSR recommended applying a *four*-level enhancement based on a finding that Uriarte was a leader or organizer.  *Id.* § 3B1.1(a).  Instead, the district court applied a three-level enhancement, noting that Uriarte's uncle was living in a "stash" house on the property where Uriarte was "running his tire shop and distributing drugs," and thus "[did not] think it[] [was] a stretch to say that Mr. Uriarte [was] telling Mr. Urias [his uncle] what to do."  Further, the court noted that Uriarte "influences [the truck drivers] to the extent of telling them where to go."

On appeal, Uriarte now claims that "the three-level increase for Mr. Uriarte being a leader/organizer [sic] was not based on reliable facts or evidence and should not have applied." He claims that his "influence" over the drivers "was relatively weak" and that his "influence" over his uncle "was equally nominal."  Uriarte's argument is unpersuasive.

19

The commentary states that, to qualify for the manager-supervisor three-level enhancement, "the defendant must have been the . . . manager[] or supervisor of one or more other participants" *or* "exercised management responsibility over the property, assets, or activities of a criminal organization." U.S.S.G. § 3B1.1(b) cmt. n.2 (2009). Thus, wholly apart from controlling and influencing people, it is enough that "[a]t a minimum" Uriarte exercised management responsibility over the property, assets, and activities of the conspiracy. *See United States v. Rose*, 449 F.3d 627, 633 (5th Cir. 2006). Uriarte does not directly dispute the district court's finding that Uriarte managed the drivers "to the extent of telling them where to go." He only casts that evidence as "relatively weak." Uriarte has not carried his burden of showing that the PSR's finding that he "employed his uncle to guard a stash house and collect drug proceeds" is "materially untrue." *United States v. Nava*, 624 F.3d 226, 231 (5th Cir. 2010). To the contrary, he says only that any related evidence "is the result of second-hand information, or complete assumptions." These assertions do not suffice to establish clear error, especially in light of the extensive testimony tying Uriarte to the acquisition, distribution, and profits of cocaine.

The district court did not clearly err in finding that Uriarte exercised management responsibility. *See Rose*, 449 F.3d at 633–34.

### D. Drug-Sniffing Dog Evidentiary Ruling

Pierre contends that the district court abused its discretion by reversing the pre-trial decision excluding the use of a police dog alert to a dresser in his bedroom at trial. The alert occurred during a search of Pierre's Mississippi residence on July 1, 2010 and led to no tangible evidence of drugs. On appeal, Pierre argues that admission of this alert "bridged the gap between acquittal and conviction," providing prosecutors with corroboration. He renews his objections under Federal Rules of Evidence 402 and 403, claiming that

admitting the drug-sniffing dog Bartje's alert is irrelevant and unduly prejudicial.

This court reviews a district court's evidentiary rulings in criminal cases for abuse of discretion subject to harmless-error analysis. *See United States v. Willett*, 751 F.3d 335, 343 (5th Cir. 2014). For any evidentiary ruling to be reversible error, the admission of the evidence in question must have affected the defendant's substantial rights. *Id.*; Fed. R. Crim. P. 52(a). "An error affects substantial rights if there is a reasonable probability that the improperly admitted evidence contributed to the conviction." *United States v. Sumlin*, 489 F.3d 683, 688 (5th Cir. 2007). "Without a reasonable probability, this court is not required to reverse a conviction." *United States v. Diaz*, 637 F.3d 592, 599 (5th Cir. 2011).

Prior to trial, Pierre asked that evidence of the alert be suppressed or excluded under Rule 403 because its probative value was substantially outweighed by the danger of undue prejudice. After the magistrate judge held a three-and-a-half hour hearing addressing Pierre's motions,[8] he concluded that suppressing the alert was not proper because testimony from the dog's training partner and an instructor from the State of Utah's police academy established that the dog was reliable. He did, however, conclude that the evidence, despite its relevance to establishing the presence of narcotics in Pierre's home, was unduly prejudicial and would confuse the issues. At trial, the Government requested that the district court permit the evidence of Bartje's alert. The Government contended that Appellants' counsel opened the door to the use of this information by questioning two Government witnesses—

---

[8] Pierre filed three different motions concerning the dog alert: a *Daubert* motion, a motion in limine, and a motion to suppress. The magistrate judge rejected the use of *Daubert* based on this circuit's unpublished decision in *U.S. v. Three Hundred Sixty-Nine Thousand Nine Hundred Eighty Dollars ($369,980) in U.S. Currency*, 214 F. App'x 432, 435, 2007 WL 143240, at *3 (5th Cir. July 24, 2007).

No. 14-40700

Sergeant Tim Bounds and Trooper Mark Fontenot—about whether they utilized dogs during searches.[9]

We agree. Appellants' respective counsel opened the door to inquiries about dog alerts when questioning Government witnesses on the use of drug-sniffing dogs during searches related to the alleged conspiracy. It is well-settled in this circuit that "[a] defendant may not complain on appeal he was prejudiced by evidence relating to a subject which he opened up at trial." *United States v. Wilson*, 439 F.2d 1081, 1082 (5th Cir. 1971) (per curiam); *see also United States v. Carey*, 589 F.3d 187, 193–94 (5th Cir. 2009) (reiterating the vitality of *Wilson's* analysis and concluding that inquiry on cross-examination "entitled the Government to elicit rebuttal evidence."); *United States v. Anifowoshe*, 307 F.3d 643, 649 (7th Cir. 2002) ("[W]hen a party questions a witness on a subject, even though that subject may not be strictly relevant to the case, the party cannot complain on appeal if the opposing party subsequently introduces evidence on the same subject.") (internal marks omitted).

During the cross-examinations of Fontenot and Bounds, the following questions were submitted: (1) Were there any dogs placed in that vehicle, K-9 dogs, to alert for any drugs or anything of that nature?; (2) That's one of the things y'all do as well, don't you, when you detain people like that, put your dogs in there to alert to see if there are drugs or drug money? (3) Did you ask for any type of drug sniffing dog to come to that location?; and (4) Did anyone call drug-sniffing dogs to do any type of alert in that truck or those individual? These questions opened the door to questions concerning drug-sniffing dogs. *See Carey*, 589 F.3d 187, 193–94. Discussing the presence of Bartje and his

---

[9] The searches subject to the questioning were not related to Pierre's Mississippi residence.

No. 14-40700

eventual alert during a search of a residence allegedly critical to the conspiracy is a natural consequence of Appellants' counsels' line of questioning. *Id.* Accordingly, we conclude that Pierre thus opened the door to the inquiries. There is no reversible error. *Id.*

### E. Motion for New Trial

Pierre next argues that the district court erred in denying his motion for a new trial after one of the Government's witnesses, Michael Jackson, later recanted testimony that Pierre sold him an ounce of cocaine. We disagree.

Jackson originally testified that he had to "beg" Pierre to sell such a small quantity because, as Jackson understood it, Pierre sold only "large quantities." In addition, he alleged that he recently saw Pierre with "large amounts of cocaine," and when police seized $80,000 from one of Pierre's houses, Pierre offered Jackson $5,000 to claim the money because Pierre "couldn't take that loss." Jackson, for reasons unclear to the panel, later explained that the only period that he ever knew Pierre dabbled in drugs was prior to the alleged conspiracy and that Pierre's wealth came from lawful means.

Denying the motion for a new trial based on Jackson recanting this testimony, the district court concluded that Pierre satisfied the first three prongs of granting such a motion, specifically that Pierre did not know of this evidence at the time of trial, his lack of knowledge was not due to any lack of diligence, and the evidence was not merely cumulative or impeaching. *See United States v. Wall*, 389 F.3d 457, 467 (5th Cir. 2004). The district court was not satisfied, however, that, as required by the final two prongs of the analysis, this evidence was material or, if introduced at a new trial, would probably produce an acquittal. *Id.* ("If the defendant fails to demonstrate any one of these factors, the motion for new trial should be denied."). In reaching this conclusion, the district court explained that a jury would simply find Jackson

23

not to be a credible witness and discredit his testimony in its entirety.[10]  As such, the district court found that the evidence was neither material nor likely to produce an acquittal.

We review "[a] district court's decision to grant or deny a motion for new trial pursuant to Federal Rule of Criminal Procedure 33. . .for an abuse of discretion." *Wall*, 389 F.3d at 465 (citation omitted).

On appeal, Pierre claims that Jackson's change of heart would have "made a difference" and the testimony was "integral" to the Government's case because there were no recordings or drug seizures that caught Pierre in the act of drug trafficking.  But Pierre overlooks the problem presented by Jackson's flip-flopping that was appropriately emphasized in the district court's decision: Jackson's reversal is unlikely to be found credible by a jury.  Instead, the jury would likely disregard Jackson's testimony in its entirety. The district court emphasized that three different truck drivers (Federico Garcia, Jorge Gaytan, and Fabian Lara) identified Pierre as the man to whom they transported hundreds of kilograms of cocaine, and that two other men (Demorae Pritchett and William Mizette) identified Pierre as the individual from whom they purchased cocaine for several years.

In light of the considerable evidence connecting Pierre to the overarching conspiracy, it is disingenuous to claim that the Government's entire case turned on Jackson's testimony.  Accordingly, we hold that the district court did not abuse its discretion in denying the motion for new trial. *See Wall*, 389 F.3d at 470–71.

---

[10] This is because Jackson first called the prosecutor threatening to report Government misconduct, then wrote the United States Marshals Service and "stated that he testified truthfully at trial," and then contacted Pierre's counsel to recant his testimony.

No. 14-40700

## F. Prosecutorial Misconduct

Though their counsel did not contemporaneously object, Appellants claim that the Government's "closing statements were contaminated with prosecutorial misconduct[.]" Appellants view the following two statements as problematic:

> [Y]ou have to believe that these four defendants were picked out of thin air and that the agents came up with this plan to frame them, got all the witnesses on board, and then got the U.S. Attorney's Office to participate as well.

> ***

> What is the motive for each of the witnesses? But then now the officers have been implicated in the conspiracy what's their motive? . . . Are [the agents] lazy and not doing a case or are they crooked and trying to get the witnesses to say certain things? Which is it? It's just spurious allegations against both of the agents who are involved in this case.

Appellants claim that these two remarks "improperly bolstered the credibility of the Government agents." We disagree.

Because Appellants' counsel did not contemporaneously object to these alleged errors, plain-error review applies.[11] *See United States v. Aguilar*, 645 F.3d 319, 323 (5th Cir. 2011).

"The test for improper vouching for a witness's credibility is whether the prosecutor's expression might reasonably lead the jury to believe that there is other evidence, unknown or unavailable to the jury, on which the prosecutor was convinced of the accused's guilt." *United States v. McCann*, 613 F.3d 486, 495 (5th Cir. 2010). This court has held that it is impermissible for a

---

[11] Appellants contend that they preserved objections but the record reveals that they did not object to the relevant statements. As this circuit's precedent makes clear, the objection must be made to the relevant statement. *See, e.g.*, *United States v. Chase*, 838 F.3d 743, 749 (5th Cir. 1988). Accordingly, we conclude that their objections were not preserved.

prosecutor to make "a largely emotional appeal to the jury to credit the arresting officers' testimony because they [are] police officers." *Id.* at 496.  But when a defendant asserts that Government agents are "either lying or mistaken, the prosecutor [is] entitled to rebut the assertion," subject to the prosecutor's "responsibility not to go beyond the evidence and make his comments appropriate in scale." *Aguilar*, 645 F.3d at 324.  "A claim of improper argument 'must be considered in light of the argument to which it responded.'" *United States v. Hernandez*, 891 F.2d 521, 526 (5th Cir.1989) (quoting *United States v. Canales*, 744 F.2d 413, 424 (5th Cir. 1984)).

Here, Appellants cannot establish error, much less plain error. Their reproduction of the Government's closing arguments leaves out the context in which the Government made those arguments.  The Government made both arguments in direct response to Appellants' counsels' representations that the Government was lying and fabricating testimony. A fuller recitation of the Government's closing statement makes clear these statements were rebuttal.

As to the first statement, the Government's immediately preceding statement addressed Kiekow's counsel's "insinuat[ion] that the Government prosecutors have suggested to the witnesses what to say and told the witnesses … and how to identify them."  This argument, the prosecutors responded, was essentially "that all the witnesses are lying, the agents are lying, and the prosecutors are trying to get the witnesses to say certain things."  It is only then that the Government continued to the first statement that Appellants challenge. The Government was thus responding to a charge of lying and fabrication.  The same is true of the second statement.  Just before making that statement, the Government described the defense presented as "everybody is lying."

No. 14-40700

The record confirms that Appellants' respective counsel argued that there was fabrication and lying by Government witnesses.[12]   Additionally, Appellants misconstrue this circuit's precedent regarding improper bolstering or vouching by the Government. There is no vouching or bolstering in the prosecutor's statements. "The prosecutor neither offered h[er] personal assurance that [witnesses] had testified truthfully nor suggested that [any witness] should be believed simply because [they were] a law enforcement officer [or affiliated with the Government]." *United States v. Jimenez-Elvirez*, 862 F.3d 527, 542 (5th Cir. 2017).  To be sure, this circuit has reiterated that prosecutors may not attempt to gain a conviction by playing to society's sensibilities toward law enforcement. *See McCann*, 613 F.3d at 495. Nevertheless, our precedent should not be construed to hamstring the ability of prosecutors to present rebuttal that is appropriate in scope and that does not suggest the existence of information not in evidence.   This is particularly so when defense counsel seek to place the veracity and character of the Government's witnesses in dispute.

Appellants essentially contend that the Government offered support for its agents and witnesses freely and unprompted.  That is not the case.  The entire transcript tells a different story—one in which the Government was merely responding to Appellants' allegations via "comments appropriate in scale." *Aguilar*, 645 F.3d at 324.   The Government is entitled to do so. Consequently, we conclude that there was no error. *See Jimenez-Elvirez*, 862 F.3d at 541–42.

---

[12] The following are a few of the comments made in by Appellants' counsel during closing arguments: (1) Well, first of all, each of the Government's witnesses has a motive to lie. . . But not only do they have a motive to lie, their testimony is uncorroborated; (2) Ladies and Gentlemen, I suggest that in this case you should not believe the testimony of the Government's witnesses; and (3) I'm concerned about a cop that destroys evidence. I'm concerned about a cop that that can't give me a straight answer.

No. 14-40700

## III.   CONCLUSION

For the foregoing reasons, we AFFIRM Appellants' convictions and the district court's denial of Pierre's motion for a new trial. As to challenges to the district court's sentencing, we AFFIRM Uriarte's sentence, but will VACATE and REMAND Kiekow's sentence to the district court for resentencing.